301 F.3d 1328
 John K. CASTLE, Leonard M. Harlan, Donald C. Carter, Double S & M Partnership, Grace & Green Arbitrage Partners, Hudson Valley Partners, L.P., Dan W. Lufkin, MCI Two Investment Limited Partnership, Robert Marston, MCD Merger Arbitrage Fund, Ltd., L.T. Foster, Northern Trust Co., Trust # 2-67917 (Kate T. Foster Trust FBO), R.C. Foster, Northern Trust Co., Trust # 2-67918 (Kate T. Foster Trust FBO), J.R. Foster, Northern Trust Co., Trust # 2-67919 (Kate S. Thompson Trust FBO), Public Service Resources, Society Bank & Trust-trustee, Zane Tankel Partners, Robert V. Dolan, M.D., Leo W. Kwan, M.D. Pension and Profit Sharing Trusts, Robert B. Lyons, Robert Margolis, Fosven Associates Partnership, Stanley E. Roberts, M.D., Sanwa Bank of California, Trustee, Yorba Linda Medical Group FBO Russell E. Ewing, Castle Harlan, Inc., and Cenwick Fund, Plaintiffs-Cross Appellants,
and
Federal Deposit Insurance Corporation, Plaintiff-Appellee,
v.
UNITED STATES, Defendant-Appellant.
 No. 01-5047.
 No. 01-5050.
 United States Court of Appeals, Federal Circuit.
 August 19, 2002.
 
 COPYRIGHT MATERIAL OMITTED John C. Millian, Gibson, Dunn & Crutcher LLP, of Washington, DC, argued for plaintiffs-cross-appellants. With him on the brief were Mark A. Perry, and Paul Blankenstein.
 John V. Thomas, Associate General Counsel, FDIC, of Washington, DC, for plaintiff-appellee. With him on the brief were Thelma Diaz, Stephen Kessler, and Ellis Merritt, Counsels, FDIC.
 David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; Jeanne E. Davidson, Deputy Director; Paul G. Freeborne, Michael M. Duclos, Katherine M. Kelly, Kenneth M. Kulak, and Jane M.E. Peterson, Trial Attorneys.
 Before LOURIE, RADER, and GAJARSA, Circuit Judges.
 GAJARSA, Circuit Judge.
 
 
 1
 This is a Winstar-related case. On cross-motions for summary judgment, the United States Court of Federal Claims ("Court of Federal Claims," or "trial court") held that two of the plaintiffs, John K. Castle ("Castle") and Leonard M. Harlan ("Harlan"), were parties to a contract that the government breached by enacting the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101-73, 103 Stat. 183, and its implementing regulations. Castle v. United States, 42 Fed. Cl. 859, 861-64 (1999) (Smith, C.J.). Also on these motions, the Court of Federal Claims determined that the remaining named plaintiffs other than the Federal Deposit Insurance Corporation (the "FDIC") were third-party beneficiaries to the breached contract, and that their third-party beneficiary status afforded them proper standing. Id. at 866. After rejecting the argument that Castle and Harlan had committed a prior material breach, the Court of Federal Claims granted summary judgment of liability against the United States for breach of contract. Id. at 867.
 
 
 2
 Following the grant of summary judgment of liability, then-Chief Judge Smith transferred the case to Judge Wiese, who held a trial on damages. See Castle v. United States, 48 Fed. Cl. 187, 191 (2000) (Wiese, J.). After a four-month trial, the court awarded the plaintiffs other than the FDIC $15.1 million in damages under a theory of restitution. Id. at 220. The trial court held, however, that the passage of FIRREA and its implementing regulations did not effect a taking of the plaintiffs' property pursuant to the Fifth Amendment of the United States Constitution. Id. Finally, the Court of Federal Claims determined that the FDIC lacked standing to assert a claim to money damages against the government. Id. Accordingly, on November 9, 2000, the court entered final judgment dismissing the FDIC from the case and awarding the remaining plaintiffs $15.1 million in damages. Castle v. United States, No. 90-1291 C (Fed.Cl. Nov. 9, 2000) (order entering final judgment).
 
 
 3
 The United States appeals. It contends that the Court of Federal Claims erred in granting summary judgment of liability for breach of contract as well as in awarding the plaintiffs other than the FDIC $15.1 million in damages on a theory of restitution. The named plaintiffs other than the FDIC cross-appeal, contending that the Court of Federal Claims erred in holding that the passage and implementation of FIRREA did not effect a taking under the Fifth Amendment, for which they are entitled to just compensation. The FDIC chose not to appeal its dismissal, and is therefore no longer a party to this case.
 
 
 4
 We conclude that the Court of Federal Claims erred in determining that the plaintiffs other than the FDIC and Castle and Harlan had standing to sue as third-party beneficiaries of the alleged contract. With respect to those plaintiffs, we vacate the Court of Federal Claims' grant of summary judgment of liability, and remand with instructions to dismiss them from the case. With respect to the remaining plaintiffs, Castle and Harlan, we conclude that the Court of Federal Claims correctly determined that the passage and implementation of FIRREA effected no Fifth Amendment taking. We therefore affirm the court's determination in this respect. We conclude, however, that the court erred in awarding the plaintiffs damages for breach of contract. The documents comprising the alleged contract did not require Castle and Harlan to contribute to the recapitalization of Western Empire. Castle and Harlan cannot recover in restitution the amounts they voluntarily contributed, nor do the circumstances of this case entitle them to damages on a theory of reliance. Consequently, we reverse the damages award. We do not decide whether the Court of Federal Claims correctly granted summary judgment of liability.
 
 I. BACKGROUND
 
 5
 As with the other Winstar-related cases, this case involves claims against the government stemming from Congress' enactment of FIRREA in response to the savings and loan crisis of the 1980s. The circumstances surrounding this crisis in the thrift industry are by now familiar; as they are well-documented elsewhere, we do not fully recount them here. See United States v. Winstar Corp., 518 U.S. 839, 843-58, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1376-78 (Fed.Cir.2001). Instead, we echo the Court of Federal Claims' succinct explanation of the pertinent facts.
 
 
 6
 In the 1980s, interest rates rose. This caused a number of savings and loan institutions, or thrifts, to become insolvent when the interest rates they were forced to pay in order to attract new deposits exceeded the income generated from mortgages entered previously at lower rates. Castle, 48 Fed. Cl. at 191. The agency that insured thrift deposits, the Federal Savings and Loan Insurance Corporation ("FSLIC"), was threatened with the exhaustion of its insurance funds. Id. The agency therefore sought private investors and healthy thrifts to take over ailing thrifts before they failed. Id. at 191-92. This was accomplished in a series of "supervisory mergers." Winstar, 518 U.S. at 847, 116 S.Ct. 2432.
 
 
 7
 As an incentive to engage in supervisory mergers, government regulators routinely agreed to afford the thrifts particular regulatory treatment. Advantageous accounting treatment of goodwill was foremost among these incentives. Id. at 848, 116 S.Ct. 2432. Supervisory mergers generated "supervisory goodwill," an amount determined by the difference between an ailing thrift's purchase price and the fair value of its identifiable assets. Although generally accepted accounting principles ("GAAP") do not permit treating goodwill as such, regulators encouraged supervisory mergers by allowing the acquirors of ailing thrifts to count supervisory goodwill toward the thrift's regulatory capital requirements, and to amortize it over an extended period of time. Such amortization allowed the acquiring institutions to report larger amounts in their regulatory capital reserve accounts than they would have been able to report had they been required to amortize the goodwill over a shorter time period. This allowed the acquiring institutions to satisfy the regulatory capital requirements without obtaining additional capital infusions.
 
 
 8
 When this approach exacerbated the crisis rather than alleviating it, Congress, on August 9, 1989, enacted FIRREA. Pub.L. 101-73, 103 Stat. 183. FIRREA overhauled the structure of federal thrift regulation. Winstar, 518 U.S. at 856, 116 S.Ct. 2432. Among other things, it required thrifts to maintain core capital of at least three percent of their total assets, and prohibited counting unidentifiable intangible assets, such as goodwill, toward this capital maintenance requirement. Id. (citing 12 U.S.C. §§ 1464(t)(2)(A), 1464(t)(9)(A)).
 
 
 9
 A number of thrifts that had engaged in supervisory mergers became unable to meet the stricter standards imposed by FIRREA, and were subsequently seized. This spawned the Winstar litigation, in which the acquirors of ailing thrifts alleged that by enacting and implementing FIRREA, the government breached contracts promising thrifts particular regulatory treatment and took property without just compensation in violation of the Fifth Amendment. In Winstar, the Supreme Court upheld this court's en banc determination that the documents executed between government regulators and the acquiring thrifts in connection with the supervisory mergers there at issue constituted enforceable agreements. Id. at 859-60, 116 S.Ct. 2432.
 
 
 10
 Hundreds of Winstar-related cases were initiated in the wake of FIRREA. In addition to Winstar itself, this court has reviewed appeals in several other Winstar-related cases. See, e.g., Frazer v. United States, 288 F.3d 1347 (Fed.Cir.2002); Bluebonnet Savs. Bank, F.S.B. v. United States, 266 F.3d 1348 (Fed.Cir.2001); Glass v. United States, 258 F.3d 1349 (Fed.Cir.2001), amended on reh'g 273 F.3d at 1072 (Fed.Cir.2001); Landmark Land Co., v. Fed. Deposit Ins. Corp., 256 F.3d 1365 (Fed.Cir.2001); California Fed. Bank, FSB v. United States, 245 F.3d 1342 (Fed.Cir.2001), cert. denied 122 S.Ct. 920 (2002); Glendale, 239 F.3d at 1384; Caguas Cent. Fed. Savs. Bank v. United States, 215 F.3d 1304 (Fed.Cir.2000); First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279 (Fed.Cir.1999). This is another such case.
 
 
 11
 In 1988, Western Empire Savings and Loan Association ("Western Empire") was a financially troubled thrift that was seeking an acquiror willing to recapitalize it. Castle and Harlan, who owned a merchant banking firm called Castle Harlan, Inc. ("CHI"), decided to pursue a "thrift project." On June 20, 1988, CHI sent a letter of intent to the board of directors of Western Empire. CHI's letter of intent proposed that CHI would acquire Western Empire by merging it into a new entity. CHI's intent letter also proposed that "[i]n connection with the Merger, capital will be contributed to Western Empire in order to comply with applicable regulatory requirements," by contributing capital to the new merger entity "and, as a result of the Merger, to Western Empire."
 
 
 12
 On November 4, 1988, Castle and Harlan submitted a "Notice of Change of Control of Western Empire Savings and Loan Association" to the Federal Home Loan Bank Board ("Bank Board"). As an attachment to this notice, Castle and Harlan submitted a business plan on Form 1173 as the regulations required ("the Business Plan"). See 12 C.F.R. § 574.6(a) (1988). The Business Plan was nontraditional; among other things, it included investment in high yield bonds. Castle and Harlan's notice also included "Requests for Forbearances, Approvals, Waivers and Certifications," as a "condition precedent" to the obligation to effect the merger.
 
 
 13
 On December 30, 1988, the Bank Board sent Castle and Harlan an approval letter "subject to the conditions and forbearances" set forth in the attached Conditions for Approval ("Conditions"). One of the conditions required that "[o]n behalf of New Western Empire the Board of Directors shall execute a Regulatory Capital Maintenance Agreement that sets forth the terms of the minimum acceptable level of Tangible Capital and the consequences of failure to meet such requirement."
 
 
 14
 That same day, the Regulatory Capital Maintenance Agreement ("RCMA" or, as it is self-styled in the alternative, colloquially, the "Pre Nuptial Agreement") was executed. The first paragraph of the RCMA recites:
 
 
 15
 THIS AGREEMENT, dated December 30, 1988, is entered into by and among Western Empire Savings and Loan Association, as the entity exists following the merger of WESL Merger Corp. and Western Empire Savings and Loan Association, a California chartered stock savings bank ("New Western Empire"); John K. Castle and Leonard M. Harlan (collectively, "Acquirors"); and the Federal Savings and Loan Insurance Corporation, a corporate instrumentality of the United States ("FSLIC" or "Corporation").
 
 
 16
 Castle and Harlan signed the RCMA, although on appeal the parties dispute whether they did so in their individual capacities or as representatives of Western Empire. The FSLIC signed the RCMA by its supervising agent, and Western Empire also signed, by its president and chief executive officer.
 
 
 17
 According to the plaintiffs, these documents — the business plan, the approval letter with attached Conditions, and the RCMA—memorialize the alleged "contract." Castle and Harlan contend that, pursuant to this contract, they agreed to acquire and recapitalize Western Empire, and that, in exchange, the Bank Board and FSLIC promised to afford Western Empire special regulatory treatment.
 
 
 18
 The business plan called for an infusion of "as much as $26 million," to recapitalize Western Empire, "but in no case will it be less than the amount necessary to capitalize the existing assets at the required rate." Upon the signing of the RCMA, Castle and Harlan contributed $500,000 into Western Empire. The other shareholder-plaintiffs contributed an additional $14.6 million. This total of $15.1 million is the consideration the plaintiffs allege they contributed in support of the contract. This amount also formed the basis for the Court of Federal Claims' restitution award.
 
 
 19
 Congress enacted FIRREA in August 1989, approximately eight months after Castle and Harlan began operating Western Empire. Castle, 48 Fed. Cl. at 192. From the outset, Western Empire's performance "lagged behind the projections set forth in the business plan." Id. (noting that commercial real estate properties were more costly and difficult to dispose of than had been anticipated, mortgage-origination rates fell short of predictions, and long-term deposits, which were the initially-proposed funding source for high yield bonds, were unobtainable).
 
 
 20
 "Due in part to these initial difficulties," in September of 1989, the Office of Thrift Supervision ("OTS") informed Western Empire that it had fallen out of tangible capital compliance, and that, pursuant to its agreement, it had 90 days to cure the deficiency. Id. In response, Western Empire attempted to remedy its capital deficiency by shrinking its asset base. Id. This allowed Western Empire to meet the minimum capital maintenance required under its alleged contract—two percent of total liabilities—without raising additional capital. Id. FIRREA, however, required more stringent capital maintenance.
 
 
 21
 By letter dated October 23, 1989, OTS informed Western Empire that its original business plan was "no longer practicable in the wake of the passage of [FIRREA]." In February of 1990, OTS placed Western Empire into receivership for failure to comply with the capital maintenance requirements imposed by FIRREA.
 
 
 22
 On September 25, 1990, Castle, Harlan, and the other named plaintiffs[1] filed suit in the Court of Federal Claims. They alleged that the passage of FIRREA and its implementing regulations breached four contractual promises and effected a taking of their property (the alleged contract) for which the Fifth Amendment requires the government to pay just compensation.[2] The four promises allegedly breached by the passage of FIRREA were that: 1) for five years, Western Empire would be permitted to meet the lesser of the capital requirements imposed by regulation or the modified capital requirement set forth in the Conditions; 2) Western Empire could include supervisory goodwill in the calculation of its regulatory capital, and could amortize it over a period of not more than twenty years; 3) Western Empire could invest up to twenty-five percent of its assets in high yield bonds for the first six months, and up to thirty-five percent of its assets in such bonds thereafter, and 4) for two years, Western Empire would not be subject to the normal liability growth restrictions imposed by regulations.
 
 
 23
 The parties submitted cross-motions for partial summary judgment regarding liability, and the United States submitted a partial motion to dismiss certain plaintiffs. The Court of Federal Claims granted the plaintiffs' motion on liability. Castle, 42 Fed. Cl. at 859. The court held that Castle, Harlan, the Bank Board, and FSLIC were parties to a contract memorialized in the business plan, the approval letter including the Conditions, and the RCMA. Id. at 861. The Court of Federal Claims also held that the shareholder-plaintiffs other than Castle and Harlan were third-party beneficiaries of this contract and that, consequently, they had standing to sue for its breach. Id. at 866. On the merits, the court agreed with the plaintiffs that the Congressional enactment of FIRREA and the promulgation of its implementing regulations breached critical components of the contract. Id. at 860. The court rejected the government's arguments that § 7(c) of the RCMA placed the risk of a change upon the shareholders, and that the plaintiffs had committed a prior material breach. Id. at 862-64, 866-67. Based upon these conclusions, the court granted the plaintiffs' motions for summary judgment of liability for breach of contract. Id. at 867.
 
 
 24
 Pursuant to the applicable case management orders, then-Chief Judge Smith, who had previously presided over the case, transferred the case to Judge Wiese for all further proceedings. Id. at 867. Before Judge Wiese, the parties conducted a four-month trial on damages. After trial, the Court of Federal Claims held that the shareholder-plaintiffs were entitled to recover as restitution their entire initial investment in Western Empire: $15.1 million. Castle, 48 Fed. Cl. at 216. The court also held that the passage of FIRREA did not effect a taking. Id. at 220. Judge Wiese entered an order of final judgment on November 9, 2000. Castle, No. 90-1291 C (Fed.Cl. Nov. 9, 2000) (order entering final judgment).
 
 
 25
 On February 12, 1999, the government had filed a motion for clarification of unresolved issues remaining in the wake of Judge Smith's opinion concerning liability. In this motion, the government argued that it had never conceded the existence of a Winstar-type contract, and requested clarification of the documents constituting the alleged contract and of the contract's duration. On December 4, 2000, Judge Smith denied the motion for clarification as moot in view of Judge Wiese's November 9, 2000, order entering final judgment. See Castle v. United States, No 90-1291 C (Fed.Cl. Dec. 4, 2000) (order denying motion for clarification).
 
 
 26
 The government appeals. On appeal, it challenges the Court of Federal Claims' grant of summary judgment of liability for breach of contract, as well as its award of damages. With regard to liability, the government advances the following five arguments: 1) no Winstar-like contract existed, 2) the plaintiffs, who are merely shareholders of Western Empire, lack standing, 3) if there was a contract, the RCMA shifted the risk of regulatory change to the plaintiffs, and therefore enacting FIRREA resulted in no breach, 4) even if enacting FIRREA would otherwise constitute a breach, any such breach is excused by a prior material breach committed by the plaintiffs, and 5) any breach that did occur by the government caused no injury. The United States also contends that the award of restitution was improper and that, at most, the plaintiffs are entitled to reliance damages reduced by their losses.
 
 
 27
 The remaining plaintiffs cross-appeal. They contend that the Court of Federal Claims erred in holding that the government did not effect a Fifth Amendment taking of their property by enacting FIRREA. Thus, they contend, they are entitled to an award of just compensation in addition to the award of damages for breach of contract.
 
 II. STANDARD OF REVIEW
 
 28
 Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.Pro. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court reviews a grant of summary judgment by the Court of Federal Claims de novo to determine whether it correctly applied this standard. California Fed. Bank, 245 F.3d at 1346 (citing Winstar Corp. v. United States, 64 F.3d 1531, 1539 (Fed.Cir.1995) (en banc) (citing Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505; Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1131 (Fed.Cir.1998)), aff'd, United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)).
 
 
 29
 The existence or non-existence of a contract is a mixed question of law and fact. Id. Contract interpretation is a question of law, reviewed de novo. Id.
 
 
 30
 Whether a plaintiff has standing to bring suit is likewise a question of law, reviewed de novo. Consol. Edison Co., v. Richardson, 233 F.3d 1376, 1379 (Fed.Cir.2000). Standing is a threshold jurisdictional issue, which implicates Article III of the Constitution and therefore may be decided without addressing the merits of a determination. Myers Investigative And Security Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed.Cir.2002) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); Arizonans for Official English v. Arizona, 520 U.S. 43, 66-67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)).
 
 III. DISCUSSION
 
 31
 We conclude that only Castle and Harlan have standing to sue for breach of the alleged contract because only Castle and Harlan signed any document constituting the alleged contract. The remaining shareholders are not parties. They also lack standing to sue as third-party beneficiaries because their sole benefit under the alleged contract was in their capacity as shareholders of Western Empire. Therefore, we vacate the Court of Federal Claims' determinations with respect to the shareholder plaintiffs other than Castle and Harlan, and remand with instructions to dismiss them from the case.
 
 
 32
 Although Castle and Harlan have standing to sue for breach of the alleged contract, we conclude that they are entitled to no damages. Because we find that Castle and Harlan have not established their entitlement to damages, we need not determine whether the Court of Federal Claims erred in granting summary judgment of liability, which it did, in part, based on a concession regarding the existence of a contract-a concession the government contends was never made. Accordingly, we reverse the damages award and expressly decline to consider the liability issue.
 
 
 33
 Finally, we conclude that the Court of Federal Claims correctly held that the enactment of FIRREA effected no taking. We therefore affirm that portion of its judgment.
 
 A. Standing
 
 34
 The Court of Federal Claims determined that the plaintiffs other than Castle and Harlan were third-party beneficiaries of a contract between Castle, Harlan, the FSLIC, and the Bank Board. The court reached this conclusion by applying the approach to third-party beneficiary status adopted by the Ninth Circuit in Far West Federal Bank, S.B. v. Office of Thrift Supervision-Director, 119 F.3d 1358 (9th Cir.1997). In Far West, the Ninth Circuit determined that the "nature and circumstances" of the supervisory merger at issue in that case demonstrated that the investor plaintiffs were third-party beneficiaries because they were intended beneficiaries of the Bank Board's promises to afford the acquired thrift particular regulatory treatment. Far West, 119 F.3d at 1363-64. Applying this logic, the Court of Federal Claims reasoned that:
 
 
 35
 The court believes that these investor plaintiffs are not parties, but are third party beneficiaries of the contract. This is clear after a quick review of the nature and circumstances of the transaction. The parties to the transaction were Messrs. Castle and Harlan, the [Bank Board] and the FSLIC. The very purpose of the contract, however, as clearly spelled out in the Business Plan of Castle Harlan (and in essence undisputed by the government), was to enshrine a modified regulatory regime under which Western Empire would operate that would induce investors to recapitalize the thrift. The capital these investors would provide was the linchpin of the agreement, not the nominal $2000 Messrs[.] Castle and Harlan paid for the value of the common stock. It was for the investors' benefit, to induce their investments, that the government made its promises.
 
 
 36
 Castle, 42 Fed. Cl. at 866. Consequently, the court determined that the plaintiffs other than Castle and Harlan had standing as third-party beneficiaries to bring a claim alleging breach of contract. The court came to this conclusion, however, without the benefit of our decision in Glass v. United States, 258 F.3d 1349 (Fed.Cir.2001).
 
 
 37
 In Glass, this court adopted a test more stringent than the one applied in Far West. We held that shareholders seeking status to sue as third-party beneficiaries of an allegedly breached contract must "demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." Glass, 258 F.3d at 1354 (emphasis added). We explained that "[s]pecifically, in order to make a shareholder a third party beneficiary, the contract must express the intent of the promissor to benefit the shareholder personally, independently of his or her status as a shareholder." Id. at 1353-54 (emphasis added).
 
 
 38
 The plaintiffs other than Castle and Harlan cannot satisfy this standard. Under the alleged contract, every promise the government failed to keep in the wake of FIRREA pertains to the regulatory treatment of Western Empire. Nothing suggests that the government made any promises, contractual or otherwise, that were expressly intended to benefit the shareholders personally, independently of their status as shareholders of Western Empire. Indeed, as the Court of Federal Claims observed in rejecting the shareholder-plaintiffs' right to seek lost profits:
 
 
 39
 The contract performance that was promised was the granting of special regulatory forbearances which the government agreed to extend to the bank. And while plaintiffs could, of course, expect to benefit from that performance as the value of the bank grew, they held no rights to that performance for themselves.
 
 
 40
 Castle, 48 Fed. Cl. at 199. It was only through their status as shareholders that these plaintiffs stood to benefit from the alleged contract. See id. (The plaintiffs other than Castle and Harlan "cannot claim more than they had in the first instance: a right to a benefit that can only come to them through the bank."). Consequently, these plaintiffs cannot meet the test for third-party beneficiary status articulated in Glass, because none of the government's alleged contractual promises conferred benefits upon them personally, apart from their status as shareholders of Western Empire.
 
 
 41
 Although the plaintiffs attempt to distinguish Glass on the basis that the plaintiffs other than Castle and Harlan are non-signatory parties, rather than third-party beneficiaries, this attempt is unavailing. The Court of Federal Claims expressly rejected the proposition that the plaintiffs other than Castle and Harlan were actual parties rather than third-party beneficiaries. Castle, 42 Fed. Cl. at 866 ("The court believes that these investor plaintiffs are not parties, but are third party beneficiaries of the contract."). We see no reason to disturb the court's finding that the shareholders other than Castle and Harlan were not parties. The finding is well-supported, because the plaintiffs other than Castle and Harlan neither negotiated with, nor promised any performance to, the government. Nor did the government make any alleged promises to these shareholders. Thus, under Glass, these plaintiffs are at most incidental beneficiaries. 258 F.3d at 1354-55. As such, they lack standing to sue for breach of the alleged contract. Id.
 
 
 42
 We have considered the plaintiffs' remaining attempts to distinguish Glass and find them to lack merit. Accordingly, we reverse the Court of Federal Claims' determination that the shareholders other than Castle and Harlan have standing to sue as third-party beneficiaries of the alleged contract. We vacate the grant of summary judgment of liability with respect to these plaintiffs, and remand with instructions to dismiss them from the case.
 
 
 43
 The government also argues that Castle and Harlan are no different than the other plaintiffs, and that they likewise lack standing. This argument is premised on the contention that Castle and Harlan signed the RCMA not in their individual capacities, but as representatives of Western Empire. We reject this premise. Castle and Harlan signed the RCMA as individuals, not as representatives of any entity. In contrast, Western Empire signed the RCMA by its president and CEO, as the face of the agreement makes plain. In fact, while the matter was pending before then-Chief Judge Smith, even the United States recognized that "Castle and Harlan as individuals" signed the RCMA. See Defendant's Proposed Findings of Uncontroverted Fact at 3-4 (emphasis added).
 
 
 44
 The RCMA is the main document comprising the alleged contract. See Castle, 48 Fed. Cl. at 199 (referring to the RCMA as "the basic contract document"). Castle and Harlan signed the RCMA in their individual capacities. They are direct parties to the RCMA. We therefore hold that Castle and Harlan have standing to allege breach of contract based upon the RCMA and the documents it allegedly incorporates: the Business Plan, and the approval letter with attached Conditions.
 
 B. Breach of Contract
 
 45
 We determine that Castle and Harlan are not entitled to damages due to the alleged breach of contract. This determination renders it unnecessary to examine whether the Court of Federal Claims erred in granting summary judgment of government liability for breach of contract. We expressly decline to reach that issue.
 
 
 46
 Castle and Harlan contend that in exchange for the government's promise to afford Western Empire particular regulatory treatment, they promised to recapitalize Western Empire. See Appellees/Cross Appellants Br., at 3-4 ("[T]he parties finalized a deal under which plaintiffs would recapitalize [Western Empire] with private capital, at no cost to the government, but to the government's great financial benefit."); Wages Decl., ¶ 7 ("As set forth in the Business Plan, the parties agreed that the consideration the government wanted — plaintiffs' money — would be provided by having the Investors purchase preferred stock and subordinated debt for cash that would go into Western Empire...."). According to Castle and Harlan, they were individually liable for the $15.1 million initially contributed by the shareholders to recapitalize Western Empire. They seek this amount in restitutionary damages for the government's breach.
 
 
 47
 The documents comprising the alleged contract, however, including the Business Plan, contain no promise by Castle and Harlan to recapitalize Western Empire in their individual capacities. They were not individually contractually obligated to contribute capital to Western Empire.
 
 
 48
 The Business Plan reveals the limited nature of Castle and Harlan's obligations. It states:
 
 
 49
 John K. Castle and Leonard M. Harlan as individuals will form a new entity ("New Western Empire") into which the present Association ("Old Western Empire") will be merged. New Western Empire will issue up to $10 million of perpetual Senior Preferred Stock to an investor group organized by Castle Harlan, Inc. in order to recapitalize the association.... The total capital infusion could be as much as $26 million, but in no case will it be less than the amount necessary to capitalize the existing assets at the required rate.
 
 
 50
 Business Plan, at 4 (emphasis added).
 
 
 51
 The RCMA — which Castle and Harlan characterize as the basic contractual document — confirms that neither plaintiff promised to be individually responsible for ensuring that Western Empire was adequately capitalized. The RCMA provides that:
 
 
 52
 New Western Empire shall maintain the Tangible Capital of New Western Empire at or in excess of two percent (2%) of Total Liabilities. Acquirors [Castle and Harlan], individually, have not agreed to maintain the Tangible Capital of New Western Empire.
 
 
 53
 RCMA at § 2(g) (emphasis added).
 
 
 54
 Thus, although Castle and Harlan signed the RCMA as individuals, they incurred no individual financial liability. Our precedent makes clear that Castle and Harlan cannot recover restitutionary damages in any amount contributed voluntarily, beyond their contractual obligations. See Landmark, 256 F.3d at 1372-77 (limiting restitutionary damages for breach of Winstar-related contract to capital contributions that were contractually required). In Landmark, this court affirmed the Court of Federal Claims' award of damages in the amount of the initial $20 million contribution the plaintiff made to the acquired thrift, a contribution which was expressly required by the contract. Id. at 1372-73. The plaintiff also sought to recover a subsequent contribution, which was not required by the contract. Id. at 1374. This court denied recovery for that voluntary contribution, stating, "[t]he law is well settled, however, that in order to be compensable as restitution, the plaintiff's contribution must have been made in performance of its contractual obligations." Id. at 1375 (citing Tangfeldt Wood Prods., Inc. v. United States, 733 F.2d 1574, 1577 (Fed.Cir.1984)). The Landmark court expressly rejected the argument that restitution was due for contributions made in the spirit of performance under the contract. Id. Thus, Landmark directly forecloses Castle and Harlan's entitlement to restitutionary damages.
 
 
 55
 Castle and Harlan also contend that the $15.12 million damages award is justified under the reliance theory of damages. This argument also fails. As we have previously explained, Castle and Harlan are the only parties who have standing to allege that they suffered injury from the alleged breach of contract. The other shareholder-plaintiffs cannot accomplish indirectly what they may not do directly; thus, Castle and Harlan lack standing to assert any reliance interest on behalf of the other shareholders. Cf. Glass, 258 F.3d at 1353-54 (holding that shareholders lack standing to sue as third-party beneficiaries to allegedly breached contract unless the contract indicates the intent to benefit them directly, independently of their shareholder status). Consequently, Castle and Harlan are not entitled to recover any of the amount the other shareholder-plaintiffs contributed to Western Empire.
 
 
 56
 Moreover, Castle and Harlan are not entitled to reliance damages in the amount they contributed individually. "The purpose of reliance damages is to compensate the plaintiff `for loss caused by reliance on the contract.'" Landmark, 256 F.3d at 1379 (quoting Restatement (Second) of Contracts § 344(b)). Castle and Harlan have demonstrated no individual loss that was caused by reliance on the contract. The greatest amount Castle and Harlan purport to have contributed to Western Empire individually is $500,000 for preferred stock, and a concededly nominal $2000 for common stock. Castle and Harlan cannot claim to have lost this amount in reliance on the government's performance of the alleged contract because, as the Court of Federal Claims explained:
 
 
 57
 [W]ithout a capital infusion in January 1990, Western Empire would have fallen out of capital compliance and been subject to seizure.... A key component of plaintiffs' damages models, then, turns on the court's willingness to accept the premise that plaintiffs would have invested an additional $10 million to keep Western Empire afloat.
 
 
 58
 Castle, 48 Fed. Cl. at 202. Absent an infusion of an additional $10 million, Western Empire would have fallen out of capital compliance, thereby committing a material breach of the RCMA prior to the enactment of FIRREA. Because Castle and Harlan would have had to contribute substantially more than the amount they now claim in reliance, the government's alleged breach cannot be said to have caused the loss of Castle and Harlan's reliance interest. The absence of a causal link between the alleged breach and the loss Castle and Harlan purport to have contributed in reliance precludes recovery of their individual contributions to Western Empire under a reliance theory of damages.
 
 
 59
 We therefore hold that Castle and Harlan may not recover damages for the government's alleged breach of contract. Because we find that Castle and Harlan are entitled to no damages, we decline to reach the issue of whether the Court of Federal Claims properly granted summary judgment of government liability for the alleged breach.
 
 C. Fifth Amendment Taking
 
 60
 We affirm the Court of Federal Claims' determination that by enacting FIRREA the government did not take the plaintiffs' property. The property allegedly taken was the plaintiffs' contract, by way of the alleged breach that occurred upon the enactment of FIRREA. The takings claim also fails.
 
 
 61
 First, the Court of Federal Claims determined that there was "no reason to contemplate a taking that does not involve the taking of contract rights," because seizure of a bank for failure to meet regulatory capital requirements does not constitute a taking. Castle, 48 Fed. Cl. at 220 (citing Branch v. United States, 69 F.3d 1571, 1575 (Fed.Cir.1995)). We agree that the seizure of Western Empire for failure to comply with the regulatory requirements imposed by FIRREA did not constitute a taking.
 
 
 62
 The Court of Federal Claims also determined that FIRREA did not effect a taking of Castle and Harlan's contract notwithstanding its holding that the government was liable for breaching the contract. Id. at 217-20. The court held that despite breaching the contract, the government did not take the plaintiffs' property because they retained "the range of remedies associated with the vindication of a contract." Id. at 219. In their cross-appeal, Castle and Harlan dispute this conclusion. They contend that the Fifth Amendment entitles them to just compensation beyond damages for breach of contract. We disagree.
 
 
 63
 The breach-of-contract based takings claim fails because even assuming it was breached, the alleged contract did not create a reasonable expectation that the government would cease regulating the thrift industry, or any particular thrift therein. As the Supreme Court noted in Winstar:
 
 
 64
 "[b]anking is one of the longest regulated and most closely supervised of public callings." That is particularly true of the savings and loan, or "thrift," industry, which has been described as "a federally-conceived and assisted system to provide citizens with affordable housing funds." H.R.Rep. No. 101-54, pt. 1, p.292 (1989) U.S.Code Cong. & Admin. News 1989, pp. 86, 88 (House Report).
 
 
 65
 518 U.S. at 844, 116 S.Ct. 2432 (quoting Fahey v. Mallonee, 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947)). In fact, by its terms, the RCMA contemplated that the regulations applicable to Western Empire were subject to change. Section 7(c) of the RCMA provides:
 
 
 66
 All references to regulations of the Bank Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.
 
 
 67
 (Emphasis added).
 
 
 68
 The plaintiffs received no contractual guarantee that the government would refrain from regulating Western Empire. At most, the contract promised either to regulate Western Empire consistently with the contract's terms, or to pay damages for breach. Cf. Winstar, 518 U.S. at 919, 116 S.Ct. 2432 (Scalia, J., concurring in judgment) ("Virtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance...."). Thus, by enacting FIRREA, the government did not deprive the plaintiffs from a contractual remedy — injunctive relief — to which they otherwise might have been entitled against a private defendant. Nor did FIRREA remove the plaintiffs' cause of action for damages. We agree with the Court of Federal Claims that the plaintiffs retained the full range of remedies associated with any contractual property right they possessed. Consequently, we hold that even assuming the enactment and enforcement of FIRREA breached a contract the government had with Castle and Harlan, it did not constitute a taking of the contract. We therefore affirm the Court of Claims' determination that the government owes the plaintiffs no just compensation.
 
 IV. CONCLUSION
 
 69
 We conclude that the plaintiffs other than Castle and Harlan lack standing, and we therefore vacate the grant of summary judgment of liability with respect to these plaintiffs and remand with instructions to dismiss them from the case. We further hold that Castle and Harlan are entitled to no damages for the alleged breach of contract, and that the enactment and enforcement of FIRREA did not effect a taking. Consequently, we affirm the Court of Federal Claims' denial of plaintiffs' claim for just compensation under the Fifth Amendment, and we reverse the Court of Federal Claims' award of restitutionary damages.
 
 
 70
 
 VACATED and REMANDED IN PART, AFFIRMED IN PART, and REVERSED-IN-PART.
 
 
 
 
 Notes:
 
 
 [1]
 These plaintiffs are either shareholders or subordinated debt holders of Western Empire (the "shareholder-plaintiffs")
 
 
 [2]
 The FDIC, as the receiver for Western Empire, intervened, but the Court of Federal Claims dismissed it for lack of standingSee Castle et al. & Fed. Deposit Ins. Corp. v. United States, No. 90-1291 C (Fed.Cl. Nov. 9, 2000) (order dismissing the FDIC). The FDIC did not appeal its dismissal.