# United States Court of Appeals for the Federal Circuit

---

**FIRST ANNAPOLIS BANCORP, INC.,**

*Plaintiff-Appellee,*

v.

**UNITED STATES,**

*Defendant-Appellant.*

---

2010-5032

---

Appeal from the United States Court of Federal Claims in case no. 94-CV-522, Judge Mary Ellen Coster Williams.

---

Decided: July 11, 2011

---

DALE A. COOTER, Cooter, Mangold, Deckelbaum & Karas, L.L.P, of Washington, DC, argued for plaintiff-appellee. Of counsel was KAREN S. KARAS.

KENNETH M. DINTZER, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were MICHAEL F. HERTZ, Deputy Assistant Attorney General, JEANNE E. DAVIDSON, Director, SCOTT D. AUSTIN and BRIAN A. MIZOGUCHI,

Senior Trial Counsel, and JACOB A. SCHUNK, Trial Attorney.  Of counsel was VINCENT D. PHILLIPS, Trial Attorney.

———————————

Before GAJARSA, DYK, and PROST, *Circuit Judges.*

GAJARSA, *Circuit Judge.*

This is a *Winstar*-related case.  The issue before this court is whether or not a holding company has standing to pursue damages for breach of contract against the United States ("Government").  The Government appeals the final judgment of the United States Court of Federal Claims ("Claims Court"), which held that First Annapolis Bancorp, Inc. ("Bancorp") had standing to sue the Government for breach of contract after the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").  *First Annapolis Bancorp, Inc. v. United States*, 75 Fed. Cl. 263, 273–74 (2007) ("*First Annapolis I*").  Because the Claims Court erred in finding that Bancorp had standing, we reverse.

BACKGROUND

A.

This case is one of the many *Winstar*-related cases, which are now reaching the final stage of litigation.  *See United States v. Winstar Corp.*, 518 U.S. 839 (1996) (plurality opinon) ("*Winstar*").  *Winstar*-related cases involve claims against the Government following Congress's enactment of FIRREA, which was passed as part of the Government's response to the savings and loan crisis of the 1980s.  *Castle v. United States*, 301 F.3d 1328, 1332 (Fed. Cir. 2002).  The background of the crisis has been well explained in other cases, *see, e.g.*, *Winstar*, 518 U.S. at 843–58, so we describe it only briefly here to provide context for the present case.

In the 1980s, many thrifts (savings and loan associations) began to fail. *Winstar*, 518 U.S. at 845. The Federal Savings and Loan Insurance Corporation ("FSLIC") lacked the funds to liquidate all of the failing thrifts. *Id.* at 847. Thus, the Federal Home Loan Bank Board ("FHLBB"), which supervised the FSLIC, encouraged healthy thrifts to merge with ailing thrifts. *Id.* at 844, 847. The FHLBB had to provide specific financial incentives to encourage these "supervisory mergers" because the ailing thrifts' purchase prices would be greater than their fair value. *Id.* at 848–49. The primary incentive provided to the parties was a promise that these acquisitions would be subject to a particular type of accounting treatment, "purchase method accounting," that would assist the acquiring thrifts in meeting the reserve capital requirements imposed by federal regulations. *Id.* at 848. In an FSLIC-sponsored supervisory merger, an acquiring thrift could designate the excess of the purchase price over the fair value of all of the ailing thrift's identifiable assets acquired as an intangible asset, called "supervisory goodwill." *Id.* at 848–49. The healthy thrift could count the supervisory goodwill as regulatory capital in meeting its federal reserve capital requirements and could amortize the goodwill asset over a long period of time. *Id.* at 851.

When Congress enacted FIRREA, it completely restructured regulation of the federal thrift industry. *Id.* at 856. The FSLIC was abolished, and the FHLBB was replaced with the Office of Thrift Supervision ("OTS"). *Id.* Pursuant to FIRREA, thrifts were required to maintain a set amount of minimum capital, and after a transition period, supervisory goodwill could no longer be included as part of the capital account. *Id.* at 857. As a result, many of the merged thrifts that had relied on the supervisory goodwill to meet their regulatory capital require-

ments were no longer able to meet those requirements, and some, such as Winstar, were seized by the Government and liquidated. *Id.* at 858. Winstar and others sued the Government for breach of contract. *Id.* This court found that the Government's passage of FIRREA breached the contract with the thrifts. *Winstar Corp. v. United States*, 64 F.3d 1531, 1551 (Fed. Cir. 1995) (en banc). In a plurality opinion, the Supreme Court held that the Government was liable for breach of contract. *Winstar*, 518 U.S. at 860.

B.

To understand the standing issue in this appeal, we must provide an historical scenario of the interrelatedness of the various institutions. First Federal Savings & Loan Association of Annapolis ("First Federal"), a federal mutual savings and loan association, voluntarily converted into a stock savings bank on July 21, 1988 when the FLHBB approved the conversion. *First Annapolis I*, 75 Fed. Cl. at 266, 269. After converting to a stock savings bank, First Federal merged with First Annapolis Savings Bank, F.S.B. ("First Annapolis"), a newly formed federal stock savings bank. *Id.* at 266. Bancorp is a savings and loan holding company that was incorporated on November 20, 1987 under the laws of the State of Delaware. *Id.* at 267, 267 n.6. Bancorp was formed "for the purpose of acquiring the stock of the merged institutions, thereby infusing capital into the converted and merged thrift." *Id.* at 266. The circumstances surrounding Bancorp's creation are central to this appeal.

First Federal posted "net losses for each fiscal year beginning with the fiscal year [that] ended on September 30, 1981" until March 31, 1988, which impacted First Federal's attempt to meet its regulatory capital requirements. J.A. 400790. On March 18, 1987, First Federal's

board of directors ("Board") decided to obtain outside capital through a supervisory conversion to increase First Federal's net worth by over $5 million. *First Annapolis I*, 75 Fed. Cl. at 266. To effectuate the conversion, First Federal submitted an Application for Voluntary Supervisory Stock Conversion[1] ("Conversion Application") to the FHLBB on November 5, 1987. *Id.* In the Conversion Application, the Board represented that it complied with the applicable rules and regulations for converting First Federal into a stock association.

First Federal also submitted a Holding Company Application ("HCA") and a Regulatory Business Plan ("Business Plan") with its Conversion Application. Bancorp, which did not exist yet, was the applicant listed on the HCA, which stated that Bancorp would "be incorporated under the laws of the State of Delaware for the purpose of acquiring [First Federal] pursuant to its voluntary supervisory conversion into a stock saving bank." J.A. 400202; *see First Annapolis I*, 75 Fed. Cl. at 267 n.6. Bancorp was incorporated on November 20, 1987 to acquire First Annapolis's stock and infuse capital into First Annapolis. *First Annapolis I*, 75 Fed. Cl. at 266, 267 n.6. On May 13, 1988, Bancorp amended the HCA and First Federal amended the Conversion Application to account for Bancorp's incorporation and to describe how Bancorp would acquire First Annapolis. *Id.* at 267 n.6. The amendment to the HCA explained that Bancorp would sell 12 million to 15 million shares of its common stock, of which the

---

[1] A voluntary supervisory conversion is where a single entity acquires all of the stock of a thrift in exchange for contributing enough capital to satisfy regulatory net worth requirements without first receiving account holder approval or offering shares on the market." *1st Home Liquidating Trust v. United States*, 581 F.3d 1350, 1353 (Fed. Cir. 2009) (internal quotations and citations omitted).

proceeds would be used to infuse at least $11 million of capital into First Annapolis. *Id.* at 267. Additionally, First Federal submitted a Plan of Conversion (attached as Exhibit A to the HCA) that contained a Miscellaneous clause stating that First Federal would "not loan funds or otherwise extend credit to any person to purchase shares of [Bancorp] Stock offered in the Conversion." J.A. 400231.

On July 8, 1987, First Federal entered into a Supervisory Agreement with the FHLBB. Under the Supervisory Agreement, First Federal was required "to submit a business plan detailing how [it] w[ould] increase its level of capital . . . to meet and maintain minimum regulatory capital levels." J.A. 400791. The Business Plan "proposed that First Federal be converted from a federal mutual savings and loan association to a stock savings bank" and, once converted, would "merge with a newly formed federal stock savings bank, First Annapolis." *First Annapolis I*, 75 Fed. Cl. at 266. It also set forth capital benchmarks that "effectively functioned as a five-year forbearance with regard to the regulatory capital requirements, whereby First Annapolis would be in compliance with the regulatory capital requirements as long as it maintained capital sufficient to meet the relaxed capital benchmarks." *Id.* at 268.

On July 21, 1988, the FHLBB "approved the voluntary conversion of First Federal from a mutual to a federal stock savings bank, the formation of First Annapolis . . . (the interim entity) and its merger with First Federal, and the acquisition of First Annapolis stock by Bancorp" by issuing two resolutions ("Resolutions"), Resolution Nos. 88-602 and 88-603. *Id.* at 269. In Resolution No. 88-603, the FHLBB conditioned the conversion's approval on: (1) First Annapolis's "achieving a ratio of net worth to total liabilities equal to at least one percent of liability com-

puted on the basis of [generally accepted accounting principles],” (2) Bancorp’s infusion of “capital in the amount of $11 million through the purchase of First Annapolis’[s] common stock,” (3) Bancorp’s stipulation that “First Annapolis would operate in accordance with the Business Plan for a period of five years,” (4) Bancorp and First Annapolis’s execution of “a Regulatory Capital [Maintenance] and Dividend Agreement [(“RCMDA”)] with the FSLIC,” (5) First Annapolis’s submission of “an opinion from an independent certified public accountant (CPA) describing any intangible assets, including goodwill, arising from the transaction and the method of amortization of the intangible assets,” and (6) the Board’s issuance of “a letter to First Annapolis concerning supervisory forbearances.” *Id.* at 269–70. In addition, “applicable state and federal laws and regulations as administered by the [FHLBB] and FSLIC” had to be complied with to the satisfaction of the supervisory agent at the Federal Home Loan Bank of Atlanta (“Supervisory Agent”). J.A. 400526.

The FHLBB also issued three letters to First Annapolis (but not Bancorp) that granted regulatory forbearances (“Forbearance Letters”). *First Annapolis I*, 75 Fed. Cl. at 270–71. On July 21, 1988, the FHLBB sent a first letter that allowed First Annapolis to: (1) “make investments in, and conforming loans to, its service corporation,” which the FHLBB later revised in a technical amendment to state “be in compliance with its minimum regulatory capital requirement” for the purpose of “complying with the service corporation investment limitations,” and (2) amortize “the value of any intangible asset” “over a period not to exceed 25 years.” J.A. 200002, 400517. On August 5, 1988, the FHLBB sent a second letter in response to First Annapolis’s “inquiry regarding the regulatory capital obligations of First Federal subsequent to its volun-

tary supervisory conversion" and stated that "it is First Annapolis'[s] obligation to increase its regulatory capital in order to achieve each annual benchmark and to achieve the regulatory capital amount specified (in the Business Plan) at the end of the fifth year." J.A. 400533. Finally, on August 11, 1988, the FHLBB sent a third letter to First Annapolis, which stated that "supervisory action" would not be taken "for failure to comply with" regulations related to "presently existing service corporation investments." J.A. 200001.

On August 12, 1988, Bancorp and the FSLIC entered into the RCMDA. The RCMDA defined the terms "Regulatory Capital," "Regulatory Capital Requirement," and "Regulatory Capital Deficiency" "as set forth in the Business Plan" for five years. J.A. 400537. In the RCMDA, Bancorp agreed to maintain First Annapolis's regulatory capital level as required, including infusing additional capital if necessary, and to not accept dividends exceeding fifty percent of First Annapolis's net income for the fiscal year without prior written approval from the Supervisory Agent. In exchange, the FSLIC agreed to approve the acquisition. The RCMDA also contained a Miscellaneous Provision that stated: "All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease [Bancorp's] obligation under this Agreement." J.A. 400540.

On February 9, 1989, the Supervisory Agent sent First Annapolis a letter stating that "all conditions precedent ha[d] been met and the Conversion [w]as . . . completed in accordance with . . . Resolution [No. 88-602]" with an effective date of August 13, 1988. J.A. 401149. However, in August 1988, prior to the conversion, First

Federal made $1.6 million in loans for the purpose of purchasing stock in Bancorp. *First Annapolis Bancorp, Inc. v. United States*, 75 Fed. Cl. 280, 283 (2007) ("*First Annapolis II*"). The Government did not learn of the loans until an examination of First Annapolis was conducted in January 1990. *Id.* at 284. On April 18, 1990, the OTS sent First Annapolis a letter regarding the report generated by the examination. The letter identified the loans as an "issue[] of supervisory concern" and required First Annapolis to "remove all loans to stockholders, the purposes of which were to purchase stock in [Bancorp], from the . . . books without material loss and without reciprocal lending arrangements with other financial institutions." J.A. 300057–58.

After the conversion, First Annapolis improved its financial condition and met its first capital benchmark set forth in the Business Plan on June 30, 1989. *First Annapolis Bancorp, Inc. v. United States*, 89 Fed. Cl. 765, 775–76 (2009) ("*First Annapolis III*"). After FIRREA became effective on August 9, 1989 and the OTS promulgated regulations on December 7, 1989, however, First Annapolis was prohibited "from treating the supervisory goodwill as an asset for the purpose of meeting its tangible capital requirement." *First Annapolis I*, 75 Fed. Cl. at 272. Thus, "First Annapolis was failing both the tangible and core capital requirements" as of December 31, 1989. *Id.* On May 31, 1990, the OTS appointed the Resolution Trust Corporation ("RTC") as receiver of First Annapolis. *Id.* On June 1, 1990, the RTC took possession of First Annapolis. *Id.*

## C.

Bancorp filed the present action in the Claims Court on August 10, 1994. This appeal is based on three Claims Court opinions in this case. In *First Annapolis I*, the

Claims Court held that Bancorp had standing to assert a breach of contract claim against the Government because "the Government's promise ran directly to Bancorp and Bancorp was 'an essential participant as a contracting party,' obligated to maintain the thrift's capital." 75 Fed. Cl. at 273–74 (quoting *Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1349 (Fed. Cir. 2005)). On summary judgment, the Claims Court found that a contract, including the RCMDA, HCA, Business Plan, Resolutions, and Forbearance Letters, was formed between Bancorp and the Government. *Id.* at 274–78. The court also found that the risk of regulatory change was not shifted to First Annapolis until five years after the conversion. *Id.* at 278–79. Finally, the court found that "the Government breached its contract with Bancorp when it began to enforce new minimum capital requirements in accordance with FIRREA." *Id.* at 279. In *First Annapolis II*, the Claims Court found that Bancorp did not commit a prior material breach of the contract by making loans to shareholders. 75 Fed. Cl. at 282. In *First Annapolis III*, the Claims Court found that "the Government committed a material breach of the contract" because "the Government agreed to give First Annapolis five years of regulatory forbearances and FIRREA eliminated those forbearances after roughly one year of performance—completely depriving First Annapolis of the benefit of its bargain." 89 Fed. Cl. at 768. Thus, the court found that Bancorp was "entitled to recover the $13,665,907 in contributed capital as money-back restitution damages." *Id.*

The Government appeals the Claims Court's decisions, raising four specific issues: (1) whether the court erred in finding that Bancorp had standing to sue the Government for breach of contract, (2) whether the court erred in finding that the risk of regulatory change was not shifted to First Annapolis during the first five years of its

operation, (3) whether the court erred in finding that Bancorp's shareholder loans were not a prior material breach of the contract, and (4) whether the court erred in finding that the Government's breach of contract was material. We have jurisdiction over the final judgment of the Claims Court pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

This court reviews the Court of Federal Claims' grant of summary judgment *de novo*. *Winstar*, 64 F.3d at 1539 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Whether a plaintiff has standing to bring suit is also a question of law, reviewed without deference. *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005) (citing *Consol. Edison Co. v. Richardson*, 233 F.3d 1376, 1379 (Fed. Cir. 2000)). Standing is a threshold jurisdictional issue that implicates Article III of the Constitution. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *S. Cal.*, 422 F.3d at 1328 (citing *Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002)).

A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim. *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003). Privity "takes on even greater significance" in *Winstar*-related cases, *S. Cal.*, 422 F.3d at 1328, because generally the Government "consents to be sued only by those with whom it has privity of contract," *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984). The lack of privity impacts the lack of waiver of sovereign immunity, which is available pursuant to the Tucker Act. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("[T]he existence of [the Government's] consent is a prerequisite for jurisdiction. . . . [B]y giving the Court of Claims jurisdiction over specified

types of claims against the United States, the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims."). The existence or non-existence of a contract is a mixed question of law and fact. *S. Cal.*, 422 F.3d at 1328 (citing *Castle*, 301 F.3d at 1336). Contract interpretation is a question of law, reviewed *de novo*. *Id.*

The Government contends that Bancorp does not have standing to sue the Government for breach of contract. For the reasons stated, we agree.

"[A] corporation is generally considered to be a separate legal entity from its shareholder." *S. Cal.*, 422 F.3d at 1331 (citation omitted). Thus, a shareholder, whether an individual or a holding company, "generally does not have standing to assert a breach of contract claim on behalf of the corporation." *Fed. Deposit Ins. Corp. v. United States*, 342 F.3d 1313, 1319 (Fed. Cir. 2003) ("*Karnes*") (citing *First Hartford Corp. v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999)). Further, shareholders are not allowed "to rely on their involvement in the negotiation process or their role in funding a transaction to alter their chosen legal status." *S. Cal.*, 422 F.3d at 1332 (citations omitted). As a result, the Claims Court correctly determined that "Bancorp must establish that it has a direct claim against the Government, separate and apart from its status as a shareholder." *First Annapolis I*, 75 Fed. Cl. at 274 (citation omitted).

The Claims Court found that Bancorp had "standing because the Government's promise ran directly to Bancorp." *Id.* The court analogized the present case to *Home Savings*, 399 F.3d 1341, in which this court found that a holding company was in privity of contract with the Government and had standing to sue. *First Annapolis I*, 75 Fed. Cl. at 273. Although Bancorp was a signatory only to the RCMDA and the amendments to the HCA, the

court noted that "Bancorp as the holding company of First Annapolis and as the 'acquiror' under the express terms of the RCMDA was referenced in FHLBB Resolution 88-603 and the Forbearance Letter dated July 21, 1988." *Id.* at 274. The court found "the *sine qua non* of this transaction was Bancorp's promise to infuse $11 million of capital into First Annapolis and to undertake a significant continuing obligation, i.e., ensuring that First Annapolis would meet its capital requirements during contract performance" in exchange for "the Government promis[ing] Bancorp that it would approve the acquisition of control of First Annapolis by Bancorp." *Id.*

In *Home Savings*, this court found a narrow exception to the general rule that shareholders lack standing. 399 F.3d at 1349–50. The court found that H.F. Ahmanson & Co. ("Ahmanson"), a holding company, was in privity of contract with the Government because it was a party to a larger transaction also involving the FSLIC, FHLBB, and Home Savings of America, FSB ("Home"), a wholly-owned subsidiary of Ahmanson. *Id.* at 1344, 1349. The transaction included "reciprocal promises that were part of the overall bargain . . . [with] the [G]overnment," in which "Ahmanson promised it would maintain Home's net worth; in exchange, the [G]overnment promised to provide financial assistance by promising certain accounting treatment for goodwill." *Id.* at 1349. Thus, this court found that the Government's promise ran "directly to Ahmanson" and Ahmanson was "in privity of contract and consequently ha[d] standing to seek damages." *Id.* Additionally, the court found that "Ahmanson [w]as the offeror that initiated the negotiations that ultimately led to the agreement." *Id.* In distinguishing other cases where this court found that shareholders did not have standing, the court found that "Ahmanson was not only a shareholder, but an essential participant as a contracting party" be-

cause it "negotiated for approval of Home's acquisitions" and was "recognized [by the FHLBB] as obligating itself, as part of that acquisition, to maintain Home['s] . . . net worth." *Id.* at 1349–50 (internal quotation omitted).

In this case, the Claims Court found that "Bancorp, like the plaintiff in *Home Savings*, was not only the sole shareholder of First Annapolis, it was actually the acquiror of the thrift. It was Bancorp which purchased all of the outstanding shares of First Annapolis, and contributed sufficient capital to First Annapolis for the merger and acquisition to go forward." *First Annapolis I*, 75 Fed. Cl. at 273. While Bancorp, like Ahmanson, was the acquiror of the thrift, critical differences distinguish the present case from *Home Savings*.

First, "Ahmanson sought federal assistance to mitigate the liabilities its subsidiary, Home, was assuming by taking over these thrifts," "initiated the negotiations that ultimately led to the agreement," and "negotiated for approval of Home's acquisitions." *Home Savings*, 399 F.3d at 1345, 1349–50. In this case, First Federal, not Bancorp, initiated the negotiations and negotiated with the Government. It was First Federal that entered into the Supervisory Agreement with the Government to avoid enforcement proceedings, "decided to infuse outside capital through a modified conversion or a modified supervisory conversion," submitted the Conversion Application and HCA to the FHLBB and FSLIC, and approved the Business Plan. *First Annapolis I*, 75 Fed. Cl. at 266. Thus, it was First Federal, not Bancorp, that was like Ahmanson and sought assistance to save the thrift.

Second, Ahmanson was able to initiate negotiations with the Government because it was established before the negotiations began. *See Home Savings*, 399 F.3d at 1345. On the contrary, Bancorp was not even in existence

at the time First Federal decided to infuse capital on March 18, 1987 or when First Federal submitted the Conversion Application and HCA on November 5, 1987. Bancorp was not incorporated until November 20, 1987, more than two weeks after the Conversion Application and HCA were submitted. *First Annapolis I*, 75 Fed. Cl. at 267 n.6. Thus, not only did Bancorp not initiate negotiations or negotiate with the Government, it did not exist at the time the negotiations began.

Third, the *Home Savings* transaction included Assistance Agreements that "contained clauses that integrated FHLBB resolutions and letters issued contemporaneously with the agreements." 399 F.3d at 1345. This court found that the FHLBB resolutions in *Home Savings* were "unified" with the Assistance Agreements because "the integration clauses defined the 'Entire Agreement' as including not just the Assistance Agreements themselves but also the related resolutions issued by FHLBB." *Id.* at 1349. Thus, Ahmanson was a "party to the larger transaction[]." *Id.* However, there is no Assistance Agreement in this case, and no "larger transaction" existed to which Bancorp could be a party. Accordingly, unlike Ahmanson, Bancorp is merely a shareholder and not "an essential participant as a contracting party." *Home Sav.*, 399 F.3d at 1349.

Bancorp's position is similar to that of some of the plaintiffs in *Southern California*. In *Southern California*, this court found that individual plaintiff shareholders did not have standing to sue on behalf of the corporation because they were not in privity of contract with the Government. 422 F.3d at 1328–33. The shareholders entered into a Regulatory Capital Maintenance Agreement ("RCMA") with the FSLIC, but were not parties to the Assistance Agreement, the "primary document governing the transaction," or recipients of a forbearance

letter from the FHLBB. *Id.* at 1325–26. This court found that the RCMA was not integrated into the Assistance Agreement and was "a separate contract that involve[d] additional parties and distinct promises." *Id.* at 1330. The court rejected the argument that "a party to one contract can be deemed a party to a related contract simply because the separate contracts constitute components of one transaction." *Id.* Although the shareholders of the holding company "initiated the conversion and acquisition processes prior to incorporating [the holding company]," "negotiated directly with the [G]overnment in arranging the transaction," and "suppl[ied] the money used to rehabilitate [the thrift]," the court found that "these roles of negotiator and shareholder do not bring the Individual Plaintiffs into privity of contract with the [G]overnment in regards to the Assistance Agreement" to which they were not parties. *Id.* at 1331.

Similarly, Bancorp was a signatory to the RCMDA, but was not the recipient of the FHLBB's Forbearance Letters. The Government's goodwill promises were contained in the Forbearance Letters, not the RCMDA. The RCMDA merely obligated Bancorp to maintain First Annapolis's regulatory capital level in exchange for the Government's approval of the acquisition—which the Government gave when it issued the Resolutions. In *Cain v. United States*, this court found that the FHLBB's "regulatory approval of the proposed conversion" was "nothing more than [its] performance of its regulatory function," which "'does not create contractual obligations'" because "'[s]omething more is necessary.'" 350 F.3d 1309, 1315 (Fed. Cir. 2003) (quoting *D & N Bank v. United States*, 331 F.3d 1374, 1378–79 (Fed. Cir. 2003)). Further, it is irrelevant whether "the regulators . . . were aware that [Bancorp] w[as] supplying the money that would be used to rehabilitate [First Annapolis]" because "[n]either

that knowledge, the supplying of the new capital, or [Bancorp's] position as [a] stockholder[]" transforms Bancorp into a party that contracted with the Government. *Karnes*, 342 F.3d at 1319. Finally, unlike the shareholders in *Southern California*, Bancorp was not the initiator or negotiator of the transaction, as discussed above. *See S. Cal.*, 422 F.3d at 1331.

For the foregoing reasons, we conclude that Bancorp does not have standing to pursue damages for breach of contract against the Government. Because the Claims Court erred in finding that Bancorp had standing, we reverse. Thus, we need not consider the Government's other appeal grounds, namely whether the risk of regulatory change was shifted to First Annapolis during the first five years of its operation, whether Bancorp's shareholder loans were a prior material breach of the contract, and whether the Government's breach of contract was material.

CONCLUSION

Because Bancorp is a shareholder that did not initiate or negotiate a contract with the Government and was not in privity with the Government, we hold that Bancorp does not have standing to sue the Government for breach of contract and reverse the Claims Court's decision.

**REVERSED**

No costs.