Richard C. LA VAN, Carmen Lullo, Ronald S. Kraar, Donald Bialon, and James Skozek, Plaintiffs,

and

Federal Deposit Insurance Corporation, Plaintiff-intervenor,

v.

The UNITED STATES, Defendant.

No. 90–581C.

United States Court of Federal Claims.

Aug. 20, 2002.

Bruce T. Logan, Chicago, IL, for plaintiff.

Mary Ann McNamar, Washington, DC, for plaintiff-intervenor.

Geoffrey J.L. Brown, U.S. Department of Justice, Washington, DC, with whom were Robert D. McCallum, Jr., Assistant Attorney General, and Director David M. Cohen, for defendant.

## OPINION

FIRESTONE, Judge.

This case is one of the cases related to *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In *Winstar*, the Supreme Court ruled that passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA") (codified as amended in various sections of 12 § U.S.C.), caused a breach of the contract that the government and Winstar Corp. had entered into in connection with Winstar's takeover of a failing savings and loan. The plaintiffs and plaintiff-intervenor in this case seek to extend the holding in *Winstar* to their circumstances.

The matters presently pending before the court are the parties' cross-motions for partial summary judgment on the plaintiffs' and plaintiff-intervenor's breach of contract claims against the United States. Plaintiffs Richard C. LaVan, Carmen Lullo, Ronald S. Kraar, Donald Bialon, and James Skozek ("plaintiffs") and plaintiff-intervenor Federal Deposit Insurance Corporation ("FDIC") allege that, as in *Winstar*, passage of FIRREA resulted in a breach of the promises made in their agreement with the government when they or the predecessor shareholder invested the capital necessary to convert a failing bank—Century Savings & Loan Association ("CSLA")—into a federally-chartered stock thrift, called Century Federal Savings Bank ("Century").

The government counters that the holding in *Winstar* does not extend to the type of transaction at issue in this case, and thus FIRREA did not result in the breach of any contract between the government, plaintiffs,

and plaintiff-intervenor. In the alternative, the government argues that even if the contract at issue was breached, none of the plaintiffs before this court have standing to seek damages for a breach of that contract.[1]

For the reasons that follow, the court concludes that the passage of FIRREA resulted in a breach of contract, and that plaintiffs Richard C. LaVan, Carmen Lullo, and the estate of Stanley Skozek have standing to maintain a claim for damages. The court further concludes that the damage claims of Ronald Kraar and Royce Bialon must be dismissed for lack of standing. The FDIC's breach of contract claims are also dismissed for lack of standing.

## BACKGROUND

### A. Facts

The following facts are not in dispute. In 1950, CSLA was chartered as a state mutual savings association. Starting in the 1980's, CSLA's financial position began to deteriorate, and by 1983, CSLA was facing serious financial losses. At the time, CSLA estimated that it would become insolvent in less than one year. Pls.' Ex. Q.[2] Faced with these losses, CSLA's Board of Directors decided that in order to save the thrift, CSLA should convert from a mutual thrift to a federally-chartered stock thrift.

In accordance with the regulations governing such conversions, CSLA's Board submitted a letter application to the Federal Home Loan Bank Board ("FHLBB") on July 25, 1983, seeking permission to convert from a state-chartered mutual association to a federally-chartered stock association. Under the regulations then in force, CSLA's Board was required to obtain the FHLBB's approval of the conversion, as well as approval of CSLA's charter, bylaws, and change in control. In the application, four "acquirors"—Richard LaVan, John Lence, Carmen Lullo, and Stanley Skozek—proposed to infuse capital into

---

1. Also pending before the court is the government's motion to dismiss the plaintiffs' and plaintiff-intervenor's takings claims. The court is deferring ruling on these claims at this time.

2. Unless otherwise noted, all citations to exhibits throughout this opinion refer to the parties' cross-motions for summary judgment on liability: the government's September 14, 1999 motion; FDIC's September 10, 1999 motion; and plaintiffs' July 19, 1991 motion.

the new bank through the purchase of stock worth approximately $300,000. On September 20, 1983, at the request of the FHLBB, the acquirors' application was amended in order to provide more capital. The correspondence from the applicants' counsel states that, "after numerous discussions" with the Principal Supervisory Agent ("PSA") at the Chicago–FHLBB, the applicants agreed to increase the capital contribution to $520,000.[3] In this letter, the acquirors also proposed two separate procedures for the acquisition of Century: the acquirors could either create a holding company or proceed in their individual capacities.[4] FDIC's Ex. 3.

As part of the application process, CSLA's Board provided the FHLBB with a "Proposed Plan of Rehabilitation" which outlined CSLA's plans to make the new institution profitable in both the short- and long-term. The Proposed Plan included a three-year plan to bring the newly-converted thrift to profitability by infusing capital and recognizing supervisory goodwill through "push-down accounting."[5] The Proposed Plan provided:

> The success of the plan for rehabilitating rests on two key points:
>
> > Converting the Association [CSLA] from a mutual to a stock association accompanied by the sale of ... stock.
> >
> > Recording this transaction under "push-down" method of accounting.

FDIC's Ex. 1 at 19. In the Appendix of the application, an independent accounting firm retained by the acquirors—Selden, Fox and Assoc., Ltd. ("Selden, Fox")—emphasized that the projections upon which the acquirors relied in making their application were based on "amortizing goodwill and all other intangibles over thirty-five years on a straight line method." FDIC's Ex. 1 at 43.

In the course of evaluating CSLA's voluntary supervisory conversion application, the PSA recognized that the applicants were eligible for the supervisory conversion because Century's projected insolvency was probably not reasonably reversible without it. FDIC's Ex. 2 at 4. The PSA also noted in its evaluation memorandum that a waiver would be needed to allow the applicants to qualify for the push-down accounting treatment they requested for the conversion. More specifically, the PSA noted that the applicants' approach was not in conformity with generally accepted accounting principles ("GAAP"), and also stated that the State of Illinois had raised a question about the use of "push-down" accounting on the grounds that "insiders" (referring to the acquirors who were also members of the existing CSLA Board of Directors) were proposing to purchase the stock to effectuate the conversion. The PSA stated that neither issue should be a bar to accepting the applicants' proposal. FDIC's Ex. 3 at 5. Based on its evaluation, the PSA finally recommended that the Office of Examinations and Supervision ("OES") (another of the FHLBB's approval arms) approve the applicants' proposal to use push-down accounting and amortize goodwill over thirty-five years.

The Director of OES took the PSA's recommendations and prepared its own recommendation for the FHLBB's Office of General Counsel. (The FHLBB had delegated the authority to approve voluntary supervisory conversions to the Office of General Counsel.) Before approving the conversion, the OES explained that final FHLBB approval by the General Counsel would require a finding that: (1) the existing institution was or would soon become insolvent; (2) there would be no equity value realizable upon liquidation by

---

**3.** The record also shows that the FHLBB carefully analyzed each applicant's financial situation to ensure that each had adequate financial resources to contribute to the new institution. *See* Pls.' Ex. Q (describing the financial arrangements being made by the individual acquirors in order to raise the capital needed to complete the conversion); Pls.' Ex. S ("[Mr. LaVan and Mr. Lence] have explained, in considerable detail, their personal financial situations, and we believe both individuals are capable of servicing their debt.").

**4.** As discussed *infra,* the acquirors ultimately proceeded in their individual capacities.

**5.** "Push-down" accounting permits an acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called "goodwill." *See Winstar,* 518 U.S. at 848–49, 116 S.Ct. 2432.

the members of the insured institution; and (3) the new institution would be viable.

Based on its review of the PSA's recommendation, the OES forwarded its own recommendation in favor of the conversion to the General Counsel. The February 10, 1984 memorandum from the OES to the General Counsel examines each of the three issues noted above, and describes how the applicants satisfied all three criteria. With respect to items (1) and (2), the memorandum states that CSLA had become insolvent and would not yield any equity value upon liquidation. According to the OES, liquidation of CSLA's assets would amount to $2 million *less* than its insured and uninsured liabilities. In addition, the OES concluded that the new institution would be viable so long as the General Counsel accepted the applicants' requested treatment of goodwill, including the use of the push-down accounting method.

In subsequent correspondence between the General Counsel's office and the OES, the OES addressed the use of "push-down" accounting and the proposed deviation from GAAP in greater detail. With respect to the use of "push-down" accounting, the OES noted that the State of Illinois had questioned whether the proposed conversion by "insiders" satisfied the criteria for an "arms' length" transaction as required by the FHLBB's internal rules. The OES, in recommending its approval of the use of "push-down" accounting to the General Counsel, stated: "[I]n our opinion the arms' length condition is met as the supervisory group of the FHLBB and the purchasing group are dealing with each other in this negotiation of the transaction with their own best interests in mind." Pls.' Ex. R.

With respect to the deviation from GAAP, the OES explained to the General Counsel on July 10, 1984, that it was clear from its correspondence with the Selden, Fox accountants that deviation from GAAP was essential to complete the conversion. In a June 25, 1984 letter from Selden, Fox to the OES, the accountants explained that if the applicants were required to follow GAAP, they could not meet their net worth requirements and would not be financially viable. The accountants' letter therefore concludes: "the

adoption of the proposed method is absolutely critical to the viability of the Association." Pls.' Ex. T. Based on its review of this letter, the OES stated in its recommendation to the General Counsel that, "Under GAAP, the association will continue to fail its net worth requirement and does not appear viable. Because we consider the association's business plan to be realistic and likely to save the company, we recommend that the RAP accounting exception be granted." Pls.' Ex. S.

Based on consistent recommendations made by the relevant staff, the FHLBB issued Resolution No. 84–448 approving the conversion on August 30, 1984. The Resolution states that it approved the conversion of CSLA from a state-chartered mutual association to a federally-chartered stock association, "to be controlled by John W. Lence, Stanley Skozek, Carmen Lullo and Richard C. LaVan ('Acquirors')." Resolution 84–448 also states that based on the various memoranda generated by the PSA, as well as the memoranda from the OES and the FHLBB's General Counsel, use of push-down accounting for goodwill was approved over a thirty-five-year period. Specifically, the Resolution provided: "for purposes of reporting to the Board, the use of push-down accounting is approved, and Century may amortize the value of any intangible asset resulting from the accounting for the purchase over a period not to exceed 35 years by the straight-line method." FDIC's Ex. 9.

Pursuant to the approved conversion, CSLA converted from a state mutual institution to a federal stock institution named Century Federal Savings Bank on September 19, 1984. Pls.' Ex. U. Century sold all of its stock to plaintiffs Mr. LaVan ($399,410), Mr. Lence ($90,000), Mr. Lullo ($10,000), and Mr. Skozek ($25,000), for a total cash infusion of $524,410, thereby generating the capital contribution required for the conversion. Following the conversion, Mr. Lence sold all of his shares in Century to the following individuals, including three of the plaintiffs named in this action: Frederick Orendach (3,000 shares), Ronald Kraar (2,200 shares), Donald Bialon (2,000 shares), and Carmen Lullo (1,000 shares).

In keeping with the Resolution, after the conversion, Century retained Selden, Fox to submit a description of the goodwill and related amortization periods to the FHLBB. Using push-down accounting, Century marked CSLA's net assets and liabilities according to their market value and booked the difference, a negative $3.5 million, as goodwill. The letter from the accounting firm stated that in accordance with Resolution 84–448, Century would amortize $3,535,970 over thirty-five years using the straight-line accounting method. FDIC's Ex. 10.

Throughout the late 1980's, Century operated without any apparent difficulty. In February 1989, the FHLBB conducted its annual review of Century, and in the resulting "Report of Special Limited Examination," it stated: "Based on the analysis performed during this examination, your institution has been assigned a composite rating of '2'.... Institutions in this group are ... fundamentally sound, but may reflect modest weaknesses correctable in the normal course of business. The nature and severity of deficiencies are not considered material and therefore such institutions are stable." FDIC's Ex. 11.

On August 9, 1989, FIRREA was enacted. Under FIRREA, the supervisory goodwill granted to Century by the FHLBB could no longer be included in calculating Century's compliance with its capital requirements under the law. As such, Century found itself out of compliance with the new minimum capital requirements. Pursuant to FIRREA, the Office of Thrift Supervision ("OTS")—the FHLBB's successor—required Century to submit a revised capital plan to meet FIRREA's requirements. Century submitted a plan, but it was rejected by the OTS on June 15, 1990. Century was therefore placed into receivership on May 3, 1991, and the OTS subsequently appointed the Resolution Trust Corporation ("RTC") as Century's receiver. All of Century's assets were transferred to a new institution, without any payment or compensation to Century's shareholders. It is not disputed that the government ultimately paid out over $2 million to depositors.

Prior to placing Century into receivership, it is not disputed that Century's shareholders had entered into to a Stock Acquisition Agreement to sell their stock to Century Savings Bancorp, Inc., a bank holding company, for $660,978.90. Pls.' Ex. D. This sale was to have been subject to the FHLBB's approval, which was granted on May 3, 1989. Pls.' Ex. E. However, after FIRREA was passed approximately three months later, and before the purchase was completed, the holding company refused to close the transaction.

## B. The Present Litigation

Plaintiffs Richard LaVan, Carmen Lullo, and James Skozek on behalf of the Stanley Skozek estate, together with Ronald S. Kraar and Royce Bialon, who bought some of John Lence's shares, filed their suit in this court on June 28, 1990. In their complaint, the plaintiffs assert that the enactment and implementation of FIRREA, combined with the subsequent seizure of Century, amount to a breach of contract that entitles them to an award of damages from the federal government in the form of rescission and restitution. More specifically, the plaintiffs seek $494,410 plus interest. These plaintiffs also seek breach of contract damages in the amount of $708,345, the amount that the FHLBB had approved for the sale of Century stock to the newly-formed holding company, Century Saving Bancorp, Inc. Plaintiffs do not seek any damages for lost profits associated with the business of the bank. The complaint also charges that the enactment and implementation of FIRREA amount to a taking without just compensation in violation of the Takings Clause of the Fifth Amendment, as well as a violation of due process.

On March 27, 1997, FDIC filed a motion to intervene together with a complaint in intervention against the United States. The FDIC also seeks restitution of goodwill and breach of contract damages based on the value of the goodwill provided to the new institution. In particular, the FDIC claims it is entitled to either $1.5 million or the value of the benefit conferred to the government in not having to liquidate the bank pre-FIRREA. Alternatively, the FDIC seeks the value of the goodwill that remained on the

books at the time of the alleged contract breach, which was $1.6 million.

On September 14, 1999, the United States moved to dismiss portions of the plaintiffs' and plaintiff-intervenor FDIC's complaints. The plaintiffs and plaintiff-intervenor simultaneously filed motions for summary judgment on their breach of contract claims. Supplemental briefs were filed following the Federal Circuit's rulings in *Glass v. United States*, 258 F.3d 1349 (Fed.Cir.2001), *rev'g in part* 44 Fed.Cl. 73 (1999), *amended by* 273 F.3d 1072 (Fed.Cir.2001) [6]; *Landmark Land Co., Inc. v. United States*, 256 F.3d 1365 (Fed.Cir.2001), *rev'g* 44 Fed.Cl. 16 (1999); and *California Fed. Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir.2001), *aff'g* 39 Fed.Cl. 753 (1997), *cert. den.*, 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002) (hereinafter *Cal Fed*). Oral argument was held on May 23, 2002.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cal Fed*, 245 F.3d at 1346. As noted above, at issue in these cross-motions on liability is whether a contract exists and, if so, whether it was breached by the enactment of FIRREA. This presents mixed questions of law and fact. *Cal Fed*, 245 F.3d at 1346. In deciding whether summary judgment is appropriate, it is not the court's function to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505.

### B. The Correspondence, Memoranda, and FHLBB Resolution Confirm the Existence of a Contract Between Plaintiffs and the Government

■ The central issue presented by the pending motions is whether the FHLBB's

approval of the conversion of CSLA into Century—together with the correspondence and memoranda that were part and parcel of the FHLBB's negotiation and approval of the conversion—gave rise to a contract between the United States and all or some of the plaintiffs, for the benefit of the plaintiff-intervenor.

The government contends that the above-noted documents did not form a contract because these documents simply reflect the exercise of the government's "regulatory" functions. The government argues that the Supreme Court's holding in *Winstar*, which made the government liable for the regulatory changes occasioned by FIRREA, is limited to cases involving "assistance agreements" or "supervisory agreements," which are not at issue here.

In response, the plaintiffs and plaintiff-intervenor argue that the Federal Circuit has resolved the contract liability issue in their favor with its *Cal Fed* ruling. Specifically, the plaintiffs and plaintiff-intervenor state that in *Cal Fed*, the Circuit determined that federal regulators are bound by the contracts they entered into in connection with unassisted transactions just as they are with assisted transactions. According to plaintiffs and plaintiff-intervenor, the *Cal Fed* ruling provides that if contemporaneous documents establish that an acquiror agreed to take over a failing thrift in exchange for favorable regulatory treatment of supervisory goodwill, a binding contract was formed. The plaintiffs and plaintiff-intervenor contend that under the precedent set by *Cal Fed*, they have established the existence of a contract.

The court's analysis begins with the Federal Circuit's holding in *Cal Fed*. The Circuit reiterated the well-settled principle that "[a]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the

---

6. The Circuit amended its decision after the parties submitted their supplemental memoranda to this court. The only change made by the Circuit was to modify a sentence in the section of the opinion dealing with FDIC's ability to recover damages.

Government." *Cal Fed*, 245 F.3d at 1346 (quoting *Massie v. United States*, 166 F.3d 1184, 1188 (Fed.Cir.1999)). In this context, the Circuit rejected the government's contention that the *Winstar* holding turned on the existence of an assistance agreement with an express integration clause. The Circuit stated: "The fact that Cal Fed did not enter into an assistance agreement ... [incorporating the forbearance letters] is not dispositive of the issue of contract formation between the government and Cal Fed." *Id.* at 1346–47. Instead, the Circuit stated that it agreed with the trial court:

> [I]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and FHLBB resolutions confirm that intent, the absence of an assistance agreement or supervisory action agreement should be irrelevant to the finding that a contract existed.

*Id.* at 1347 (quoting *Cal Fed*, 39 Fed.Cl. at 773). Accordingly, based on the contemporaneous documentation surrounding the "unassisted" transactions in *Cal Fed*, the Circuit concluded that the FHLBB and FSLIC were contractually bound to recognize the supervisory goodwill and amortization periods reflected in the forbearance letters issued in connection with their approvals of Cal Fed's acquisition of certain insured thrifts. Having resolved the contract issue in favor of plaintiff Cal Fed, the Circuit went on to hold that FIRREA had caused a breach of that contract, and to analyze the proper measure of Cal Fed's damages.

In supplemental briefs filed with this court after the *Cal Fed* decision, the government argues that *Cal Fed* is not controlling because the *Cal Fed* decision:

> appears to [be based] upon the belief that there were extensive "negotiations" between the Government and California Federal. 245 F.3d at 1347 *In this case ... there were no negotiations between the Government and Plaintiffs, and the reasoning of the Cal Fed panel on this issue thus is not applicable to the facts of this case.*

(Emphasis added). The government argues that both the terms of the Resolution and the amount of capital contributed by certain of the named plaintiff "acquirors" in this case were dictated by regulation, and were therefore *not* the subject of negotiations. In addition, the government argues that *Cal Fed* is not controlling, because the instant case did not include a "bargained-for exchange." The government contends that the regulators did not approach the plaintiffs, did not seek the conversion, and did not give the plaintiffs any special benefits in connection with the conversion. In this vein, the government argues that the regulators were not asked for any special concessions with regard to "goodwill." In summarizing its position, the government states: "Simply put, there is no evidence to suggest that regulators were asked, or offered, to allow any accounting treatment not ordinarily available under GAAP at the time." After carefully reviewing the government's arguments, the court finds that the government's position is based on a misreading of the record and must therefore fail.

A review of the undisputed facts of this case demonstrates that the FHLBB specifically acquiesced to the acquirors' request for special treatment of goodwill in order to keep the FHLBB from having to liquidate CSLA. The conversion application stated that rehabilitating CSLA would rest on "converting the Association from a mutual to a stock association" and "recording the transaction under 'push-down' method of accounting." The documents also show that the acquirors sought to employ an accounting method that did not conform to GAAP, and that special FHLBB approval was required. As described fully above, in evaluating the financial condition of Century after the conversion, the Selden, Fox accountants told the FHLBB: "This accounting method is not in accordance with current generally accepted accounting principles [GAAP]. However, the projection [of financial condition after conversion] has been prepared in this manner so that it may be submitted with the request for approval to adopt this method of accounting for the conversion to a federal stock chartered association." FDIC's Ex. 1 at 39.

The subsequent discussions by the various FHLBB offices related to the acquirors' re-

quest further confirm both the special nature of the request and the importance of the proposed accounting approach to the conversion. The PSA and OES expressly noted that the FHLBB would have to specially approve the use of "push-down" accounting and the proposed thirty-five-year amortization period in order to secure the acquirors' participation, approve the conversion, and accordingly prevent CSLA from having to liquidate. Pls.' Ex. Q.

The OES, in its memoranda to the FHLBB General Counsel recommending final approval of the conversion, also noted that the applicants' request deviated from GAAP and therefore required special approval of the push-down method of accounting. As discussed above, in its July 9, 1984 memorandum to the FHLBB's Associate General Counsel, the OES stated that the FHLBB should reject the State of Illinois' objections to the use of push-down accounting in the Century conversion on the grounds that the applicants were "insiders" to the transaction and thus the transaction did not qualify as an "arms' length" transaction. Perhaps most importantly, the OES memorandum specifically acknowledges that the FHLBB and the acquirors were engaged in "negotiations" that benefitted both sides. The memorandum states, in pertinent part: "In our opinion the arm's length condition is met as *the supervisory group of the FHLBB and the purchasing group are dealing with each other in the negotiation of the transaction with their own best interests in mind.*" Pls.' Ex. R (emphasis added).[7]

Letters on the record in this case clearly confirm why the acquirors' request to deviate from GAAP in the treatment of goodwill was critical to the agreement between the FHLBB and the acquirors because such treatment was absolutely necessary to make the conversion viable for the acquirors. In response to an inquiry from the OES, Selden, Fox wrote a letter on June 25, 1984, explaining the pertinent projections and assumptions upon which the acquirors were relying in pursuing the conversion of the CSLA. The

accountants stated, "the adoption of the proposed [push-down method over thirty-five years straight line] is absolutely critical to the viability of the Association." Pls.' Ex. T. After receiving this information from Selden, Fox, in a July 10, 1984 memorandum from the OES to the FHLBB General Counsel, the OES states:

> Century has requested a RAP exception to allow goodwill from push-down accounting to be amortized over 35 years on a straight line basis. By letter dated June 25, 1984, the association's independent accountants compared the effect of goodwill amortization under GAAP versus the proposed RAP treatment. . . . Under GAAP, the association will continue to fail its net worth requirement and does not appear viable. Because we consider the association's business plan to be realistic and likely to save the company, we recommend that the RAP accounting exception be granted.

Pls.' Ex. S.

In view of the foregoing, the court finds that the facts and circumstances surrounding the August 24, 1984 Resolution approving the conversion establishes a bargained-for agreement in which the acquirors agreed to infuse capital into the institution, and thus save the bank from immediate liquidation, based on the express understanding that they would in exchange receive the above-specified treatment of goodwill. The government's contention that the treatment of goodwill was not the subject of negotiations or part of a bargained-for exchange is refuted by the undisputed facts in the record. All of the elements necessary for contract formation are present in this case: the evidence establishes that the applicants made an offer, that the offer was accepted, and that consideration was paid. *City of Cincinnati v. United States,* 153 F.3d 1375, 1377 (Fed.Cir.1998) ("Like an express contract, an implied-in-fact contract requires '(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance.' "). Based on these facts, the court finds that an im-

---

7. In view of this admission by the FHLBB, the government's reliance on the statements of various named plaintiffs that they did not *personally* negotiate with the FHLBB is irrelevant. Plainly, the FHLBB saw the various communications between itself and plaintiffs' counsel and accountants as "negotiations."

plied-in-fact contract was formed which governed the treatment of goodwill, and that the government was bound by the terms of that agreement.

## C. FIRREA Resulted in a Breach of the Conversion Agreement

■ Having concluded that there was an agreement regarding the treatment of goodwill, the court now turns to the issue of breach. The plaintiffs and plaintiff-intervenor argue that enactment of FIRREA and the implementation of the OTS regulations resulted in a breach, because Century was no longer able to use goodwill to meet its various regulatory requirements. The government does not dispute the effect of FIRREA on the plaintiffs' use of goodwill.

In such circumstances, the government is liable for a breach of contract. As the Federal Circuit held in *Winstar v. United States,* 64 F.3d 1531, 1544–45 (Fed.Cir.1995), and *Cal Fed,* 245 F.3d at 1347–48, where, as here, the application of FIRREA and the implementing regulations resulted in the government's inability to honor its commitments regarding the use of goodwill, the government is liable for a breach of contract.

## D. Standing

Having concluded that the government is liable for breach, the remaining issue to be decided with respect to liability is the identity of the parties who can maintain claims based upon that breach of contract. Which of the plaintiffs, including the plaintiff-intervenor, may rightfully maintain a claim for the government's breach of contract? This question requires the court to determine the identity of both the contracting parties and the third-party beneficiaries.

First, the government contends that the three named plaintiffs who were identified as "the acquirors" by the FHLBB—Messrs. LaVan, Lullo, and Skozek (on behalf of his father's estate)—do not have standing because they did not enter into a contract with the government. The government argues that although these individuals contributed the cash necessary for the conversion and were expressly named as "the acquirors" in FHLBB Resolution No. 84–448, they are merely "shareholders" in Century Federal Savings Bank and thus do not have a direct contract relationship with the government. Second, the government argues that the remaining plaintiffs—Messrs. Kraar and Bialon—have no standing in this litigation as either contracting parties or third-party beneficiaries because they purchased their shares in Century in 1988, four years *after* the bank's supervisory conversion which forms the basis of the contract claim. Given these arguments, the government concludes that the only possible contracting party, "if anyone," was the failed bank, Century.

In opposition, the plaintiffs argue that Messrs. LaVan, Lullo, and Skozek had a direct contractual relationship with the government as the named acquirors of the new institution, while Messrs. Kraar and Bialon have standing as the intended third-party beneficiaries of that contract.

■ The court first considers the standing of the plaintiffs in the original acquiring group. According to the government, plaintiffs LaVan, Lullo, and Skozek are not direct contract parties with the government, but are instead simply shareholders who have no standing to pursue this litigation. According to the government, these three acquirors are mentioned by name in the FHLBB resolutions only because CSLA, the real party in interest, was required by law to obtain FHLBB approval of the individuals who would gain a controlling share in the new bank, Century.

The government relies heavily on *Glass v. United States* to support its argument. *See Glass,* 258 F.3d 1349 (Fed.Cir.2001); 44 Fed. Cl. 73 (1999). According to the government, in *Glass,* plaintiffs who were similarly-situated to the plaintiffs before this court were denied standing by both the Court of Federal Claims and the Federal Circuit. In *Glass,* the four principle shareholders of Sentry Mortgage Corp., the acquiring institution, negotiated a reverse purchase agreement engineered to exchange its assets and liabilities for shares of stock in a failing thrift called Security Savings Bank, FSB. Sentry was consequently dissolved, and Sentry's shareholders became the shareholders

and directors of Security. As part of the transaction, the named plaintiffs in *Glass* were required to individually sign Regulatory Capital Maintenance Agreements ("RCMAs") that personally obligated each of them to contribute additional assets to the bank if its capital level declined below a certain threshold.

The Court of Federal Claims held that the named shareholders were not direct parties to the contract:

> The documentary evidence shows, however, that individually the four private plaintiffs did not contract for the treatment of goodwill resulting from the acquisition; Sentry did. Sentry, of course was subsumed as a result of the acquisition and the shareholders became controlling shareholders of Security. They are not parties to the contract.

*Glass*, 44 Fed.Cl. at 79. Instead, the trial court granted the *Glass* plaintiffs third-party beneficiary status, a ruling that the Circuit later overturned, denying the named plaintiffs any contract status at all. *See Glass*, 258 F.3d at 1354–55.

Here, the government argues for the same treatment for plaintiffs LaVan, Lullo, and Skozek, because the government argues that they are "in a worse position to assert that they are direct parties" than the *Glass* plaintiffs were. The similarities, as listed by the government, are as follows: in both transactions, an existing institution's shareholders initiated the supervisory action to save the failing bank; in both, the failing institution was subsumed into the acquiring one; in both, the resolution allowed the acquiring institution to account for the transaction in a particular way; and, in both transactions, the acquiring shareholders became the controlling shareholders in the new institution. But in *Glass*, where the shareholders were required to individually commit to maintain certain capital levels, no such commitment was made by plaintiffs LaVan, Lullo, and Skozek.

According to the government, the holding in *Castle v. United States*, 48 Fed.Cl. 187 (2000), *aff'd in part, rev'd in part by* 300 F.3d 1328 (Fed.Cir.2002), also undercuts the argu-

ments made by the plaintiffs currently before this court. In *Castle*, the Court of Federal Claims identified all the following documents as evidence of the contract with the named plaintiffs: the RCMA; a Consent Agreement signed by the plaintiffs, the FSLIC, and the president of the bank; the Acquisition approval letter issued by the FHLBB; and the business plan submitted by the plaintiffs in support of the reorganization plan. In *Castle*, only two investor plaintiffs were found to be direct parties to the agreement as acquiring shareholders: the two who signed, among other documents, the RCMA that was also executed by the FSLIC and the president of the bank. (This portion of the Circuit's decision was affirmed, as was the dismissal of the shareholders who had not signed any of the agreements with the government.) Because there is no RCMA in the instant case, the government argues that it must be distinguished from *Castle*.

Finally, the government also points to *Karnes Cty. Savings & Loan Ass'n v. United States*, 52 Fed.Cl. 503 (2002), as supporting its arguments in this respect. In *Karnes Cty.*, shareholder plaintiffs bought a failing thrift and requested regulatory forbearances as part of the deal. Because the plaintiffs were not named in the documents underlying the transaction—mostly letters to government regulators from Karnes, a "New Association"—the plaintiffs argued that because they were a "driving force" in the deal, their investment in the acquisition of the thrift made them direct parties to the contract with the government. The court disagreed, and found that the plaintiffs were not party to the contract concerning the forbearances. The government urges the same outcome in the instant case.

The court must disagree, and finds that each of the cases relied upon by the government does not demand that the named plaintiffs be dismissed from the instant case for one key reason: the undisputed facts plainly establish that Messrs. LaVan, Lullo, and Skozek were, as individuals, "the acquirors" who negotiated with the FHLBB to purchase the converted federally-insured institution. These individuals were the direct purchasers

who then became "shareholders" in the new institution.[8]

Internal memoranda and correspondence with plaintiffs' counsel and the independent accounting firm confirm that the FHLBB understood that it was dealing with the named individuals.[9] In the FHLBB's response to the concerns raised by regulators in the State of Illinois about dealing with these "insiders" as individuals, the FHLBB expressly concluded that the government had engaged in a proper "arms' length transaction" with these individuals. Indeed, the FHLBB Resolution itself identifies them by name, and identifies them as "Acquirors." In these circumstances, the court concludes that there was in fact a bargained-for exchange here, between the government and plaintiffs LaVan, Lullo, and Skozek.

In view of the above-noted facts, the plaintiffs in the instant case are clearly different from the shareholder plaintiffs in *Glass*. The named plaintiffs in *Glass* obtained their alleged contract rights when their corporation, a bank holding company called Sentry Mortgage Company, acquired controlling interest in the resulting new institution, Security. As described by the Federal Circuit, in the *Glass* transaction, the shareholders caused Sentry to enter into a "reverse-purchase" agreement with Security Savings Bank whereby Sentry was to contribute all of its non-cash assets to Security Savings in exchange for a controlling interest in Security Savings' stock. Under this agreement, Sentry would dissolve following the contribution of its assets and the Security Savings stock would be transferred to Sentry's shareholders. *See Glass*, 258 F.3d at 1351. Hence, throughout the *Glass* transaction, the plaintiffs were always shareholders in the involved institutions. In contrast, in the in-

stant case, the deal is with the named individuals as the acquirors.

The Federal Circuit's August 19, 2002 partial affirmance of *Castle* is also consistent with this court's analysis. While the acquirors in the instant action were not required to sign an RCMA, the nonexistence of an RCMA is not dispositive. Instead, what matters in these cases is identifying the parties to the transactions at hand, which is done by looking at the *entire* factual record, and not just the presence or absence of one document. *See Cal Fed*, 245 F.3d at 1347 (We agree with the Court of Federal Claims that "if the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and FHLBB resolutions confirm that intent, the absence of an assistance agreement or supervisory action agreement should be irrelevant to the finding that a contract existed.") (quoting *Cal Fed*, 39 Fed.Cl. at 773). Just like the *Castle* plaintiffs, plaintiffs LaVan, Lullo, and Skozek are identified by numerous documents, including the FHLBB Resolution, individually, and as "the acquirors." The court finds, on this record, that the decision in *Castle* is consistent with the standing decision in this case.

And finally, the court concludes that *Karnes Cty.* similarly does not demand a ruling in favor of the government. In that case, the individual shareholder plaintiffs named the Lees were not parties to the contract between the bank, Karnes, and the United States. The documents that they relied upon to make their claims were letters to government regulators from Karnes, called a "New Association," and not the individuals as acquirors. In fact, the letters were from the Chief Executive Officer of Karnes, who stated repeatedly that he was

---

8. While it is certainly true that the three plaintiffs discussed here became "shareholders" at the end of the transaction as a result of their infusion of cash into Century, that fact does not detract from their status as the individual "acquirors" who made up the "the purchasing group." The government's attempt to cast plaintiffs LaVan, Lullo, and Skozek as simply "shareholder plaintiffs" identical to those shareholder plaintiffs denied direct party standing in other *Winstar* cases—

such as *Castle* and *Karnes*—is overly simplistic, for the reasons discussed *infra*.

9. As discussed above, at one point Messrs. LaVan, Lullo, and Skozek considered creating a holding company to effectuate the acquisition. *See* FDIC's Ex. 3. However, they ultimately decided to proceed with the conversion and acquisition as individuals, with the approval of the FHLBB.

acting on behalf of the New Association. The letters did not include any mention of the Lees. *Karnes Cty.*, 52 Fed.Cl. at 507.

For all of the above reasons, the court finds that plaintiffs LaVan, Lullo, and Skozek have standing to bring this claim for breach of contract as direct parties to an implied-in-fact contract with the government. The government's arguments that such a holding is contrary to established *Winstar* precedent are without support.

■ In contrast to the above-mentioned individuals, the court finds that plaintiffs Kraar and Bialon must be dismissed from this litigation for lack of standing. It is not disputed that they acquired their shares of stock in Century after the conversion, and without any FHLBB involvement. Thus, neither was a direct party to any contract with the FHLBB. Instead, plaintiffs Kraar and Bialon claim standing as shareholders in Century, who purchased their shares from Mr. Lence, one of the original acquirors, approximately four years after the conversion.

In *Glass*, the Federal Circuit recently clarified the circumstances in which such plaintiff shareholders have standing in a *Winstar*-related lawsuit. The Circuit held that absent evidence that the plaintiff shareholders were identified as direct beneficiaries in the contract between the acquirors and the FHLBB, incidental shareholder beneficiaries do not have the right to enforce the contract. *See Glass*, 258 F.3d at 1354–55; *reaff'd by Castle v. U.S.*, 301 F.3d 1328, 1338–39. There is no evidence in the record to show that these plaintiffs were identified as direct beneficiaries to the contract between the acquirors and the FHLBB, and accordingly, their claims must be dismissed. For the same reasons, any claim made by Mr. Lullo pertaining to the 1,000 shares he purchased from Mr. Lence must also be dismissed.

■ Finally, the court turns to the FDIC's standing to maintain a breach of contract claim. It is not disputed that the maximum damages the FDIC claims on behalf of Century in this case is $1.6 million.

It is also not disputed that the failed thrift owes the United States in excess of $4.7 million ($2.3 million in principal plus $2.4 million in interest). In *Landmark* and in *Glass*, the Federal Circuit held that unless the FDIC has a plausible claim for a recovery that exceeds the amount owed to the United States, the FDIC does not have standing with respect to the breach of contract claims asserted in its complaint-in-intervention. "[W]e hold that, in this case, where the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satisfied." *Landmark*, 256 F.3d at 1382. The Circuit went on to explain that only where the FDIC's presence is needed to resolve the breach of contract claim is dismissal not appropriate. *See id.* Here, the FDIC concedes that it has no entitlement to any recovery received pursuant to the breach of contract claims asserted by plaintiffs LaVan, Lullo, and Skozek. As such, because the FDIC's claim is for less than the amount owed to the government, the FDIC may not maintain its breach of contact claim as plaintiff-intervenor.

### E. Conclusion

For the above-stated reasons, plaintiffs LaVan, Lullo, and Skozek have standing to maintain this action for contract damages. The court finds that the government entered into an implied-in-fact contract with these three plaintiffs, and that the government breached that contract with the passage of FIRREA. Accordingly, the government's motion for summary judgment as to liability to plaintiffs LaVan, Lullo,[10] and Skozek is **DENIED**, and plaintiffs' motion for summary judgment as to liability for these three individuals is **GRANTED**.

Under Rule 54(b) of the United States Court of Federal Claims, the clerk is directed to **DISMISS** plaintiffs Kraar and Bialon from this suit for lack of standing, and to **DISMISS** plaintiff-intervenor FDIC's breach of contract claim from the suit. At this time, the court reserves ruling on dismissing the

---

10. As noted above, Mr. Lullo's claim is limited to the value of his initial $10,000 investment.

FDIC from the entire action, pending final resolution of plaintiffs' takings claims.

The parties shall contact the court by Monday, September 9, 2002, to set a schedule for resolving the remaining issues in this case.