Richard C. LA VAN, Carmen Lullo, and James Skozek, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 90–581 C.

United States Court of Federal Claims.

June 10, 2003.

Bruce T. Logan, Chicago, IL, for plaintiff.

Elizabeth Marie Hosford, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant.

## CORRECTED OPINION [1]

## OPINION

FIRESTONE, Judge.

Defendant, United States ("government"), has moved for summary judgment with respect to all of the plaintiffs' claims for monetary relief in this *Winstar*-related case, including all of plaintiffs' remaining causes of action for restitution, rescission and a government taking under the Fifth Amendment of the United States Constitution. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Plaintiffs have cross-moved for summary judgment in support of their claims for restitution, reliance and expectancy damages. Oral argument was held on May 21, 2003. For the reasons discussed below, the parties' respective motions for summary judgment, filed on December 16, 2002 and December 20, 2002, are **GRANTED IN PART** and **DENIED IN PART**.

### FACTS

## I. BACKGROUND FACTS

On August 20, 2002, this court concluded that the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No.101–73, 103 Stat.183 (1989) ("FIRREA"), resulted in a breach of the government's contract with plaintiffs, regarding the conversion of Century Savings and Loan Association ("CSLA") into Century Federal Savings Bank ("Century"). *See La Van v. United States*, 53 Fed.Cl. 290 (2002). The factual background of this case is set forth in the court's liability opinion and will not be repeated here. The facts relating to the plaintiffs' monetary and remaining claims are set forth below.

The following facts are undisputed, unless otherwise noted.[2] It is uncontested that as part of the conversion transaction approved by the government, the plaintiffs and a Mr. Lence purchased all of the stock of the newly-created Century for $524,410.[3] These payments were to be paid into Century by the Federal Home Loan Bank Board ("FHLBB") Resolution No. 84–448 and FHLBB Resolution 84–449. In particular, Mr. LaVan paid in $399,410; Mr. Lullo paid in $10,000, and Mr. Skozek paid in $25,000. Mr. Lence, who is not a party to this case, paid in $90,000. Mr. Lence sold all of his shares in Century after the conversion.

On September 28, 1988, plaintiffs and Century's other shareholders (successors to Mr. Lence's shares) entered into a preliminary "Stock Acquisition Agreement" with Century Savings Bancorp, Inc. The preliminary agreement provided that 46,190 of the 56,636 shares of common stock in Century would be purchased for $14.31 per share. On May 3, 1989, the FHLBB approved Century Bancorp's proposed purchase of Century, subject to certain conditions. In July 1989, the parties entered into an amendment to the Stock Acquisition Agreement, which among other things, extended the closing date of the stock sale to September 15, 1989, in order to allow the parties to consider the possible impact of FIRREA upon the transaction. On August

---

[1] This is a re-issuance of the court's May 28, 2003 opinion. This is a corrected copy and does not alter the outcome of the original opinion.

[2] On February 10, 2003, plaintiffs moved to strike the government's proposed findings of fact on the grounds that the attachments were "unverified." In response, the government explains that under the relevant procedural orders in this case, all documents included in the Defendant's Appendix are presumed to be authentic. "Master Stipulation at subsection B." The plaintiffs have not refuted this contention. Plaintiffs' Motion to Strike is **DENIED**.

[3] As discussed in the liability opinion, the record shows that the FHLBB analyzed the financial situation of each acquirer to ensure that each had adequate resources to make their individual capital contribution. *La Van*, supra, at 293 n. 3.

30, 1989, Mr. LaVan informed Century's board of directors that the stock acquisition agreement was null and void. No reason for the termination was identified in the board of director's minutes. Mr. LaVan states in his affidavit that Century Savings Bancorp refused to go through with the transaction because of the passage of FIRREA and the loss of goodwill as a capital asset. Government documents indicated that as of April 26, 1989, Bancorp had to raise $591,000 to purchase Century's stock. In addition, the government has provided documents to show that Century recorded losses and a corresponding reduction in regulatory capital, of almost $200,000 during the three quarters after signing the Stock Purchase Agreement.

Following passage of FIRREA, Century was not able to meet the new capital requirements and was placed in receivership. Prior to being placed in receivership, plaintiffs filed the present action in June 1990, seeking restitution and other damages for the government's failure to honor the terms of the conversion transaction following enactment of FIRREA.

## II. PLAINTIFFS' DAMAGES CLAIMS

Plaintiffs have moved for summary judgment on their claims for restitution damages, or $434,410, for the amounts they paid into Century as part of the FHLBB-approved conversion of Century. Plaintiffs argue that they are entitled to this amount on the grounds that they were required to pay that amount into Century in order to obtain government approval of the transaction. In the alternative, they seek expectancy damages or reliance damages in the amount of $621,640.71, which they assert was the market value of their shares in Century prior to the passage of FIRREA, as set forth in the Stock Purchase Agreement.

Plaintiffs also pray for the entry of summary judgment *nunc pro tunc* to the time of their initial motion for summary judgment in 1991. Recognizing that pre-judgment interest is not available on their claims, plaintiffs assert that "this would allow the plaintiffs to recover interest at the judgment rate."

## DISCUSSION

### I. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is required where there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rules of the United States Court of Federal Claims ("RCFC") 56(c); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1071 (Fed.Cir. 1994); *Mingus Constrs., Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, if the nonmoving party produces sufficient evidence to raise a question that would alter the outcome of the case, summary judgment must be denied. In making this determination, the court is mindful that any doubt over a factual issue must be resolved in favor of the nonmoving party. *Id.* at 587–88, 106 S.Ct. 1348.

The party moving for summary judgment has the burden initially of pointing out the absence of any genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant discharges this burden, the non-movant must demonstrate specific facts showing a genuine dispute of fact for trial. *Matsushita Elec.*, 475 U.S. at 586–87, 106 S.Ct. 1348; *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed.Cir.1994). Thus, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *see also Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Ultimately, "[o]nly disputes over facts that might affect the outcome of the suit . . . will proper-

ly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

## II. PLAINTIFFS' DAMAGE CLAIMS

### A. Plaintiffs' Restitution Claim [4]

■ Restitution is a remedy for a breach of contract which aims to restore to the non-breaching party any benefit that it might have conferred on the other party as a result of the contract, less any benefit the non-breaching party received under the contract. *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380–81 (Fed.Cir.2001); Restatement (Second) of Contracts § 344(c) (1981). In this case, plaintiffs contend that at a minimum they are entitled to a return of their original investment of $434,410, which they were individually required by the FHLBB to pay into Century in order to obtain the FHLBB's approval of the CSLA conversion.

■ The court agrees that restitution is an appropriate remedy in this case and that return of their initial investment, or $434,410, is the proper measure of restitution. The court finds that this case is not materially distinguishable from the situation addressed by the Federal Circuit in *Landmark Land v. FDIC,* 256 F.3d 1365 (Fed.Cir.2001), in which the Federal Circuit upheld the remedy of restitution. In that case, the Federal Circuit upheld a restitution award in which the trial court determined that a return of Landmark's contributions to the acquired institution, which Landmark had been required to make under an Assistance Agreement, was an appropriate measure of restitution. *Landmark,* 256 F.3d at 1372–75. As the Federal Circuit later explained in *Castle v. United States,* 301 F.3d 1328 (Fed.Cir.2002): "In *Landmark,* this court affirmed the Court of Federal Claims' award of damages in the amount of the initial $20 million contribution the plaintiff made to the acquired thrift, a contribution which was expressly required by the contract." *Id.* at 1340.

The government argues that the plaintiffs' are not entitled to restitution in this case. Without referencing *Landmark,* the government relies on several other Federal Circuit *Winstar*-related cases where the remedy of restitution was rejected. In particular, the government relies on the holdings in *Glendale,* 239 F.3d 1374 and *California Fed. Bank, FSB, v. United States,* 245 F.3d 1342 (Fed.Cir.2001) to argue that the Federal Circuit has determined that restitution based on the alleged benefits conferred on the government as part of a bank conversion is not an appropriate remedy. In addition, the government argues that restitution is not appropriate here because the government never received a direct benefit from the plaintiffs in this case. The government contends that plaintiffs' initial cash contribution went to Century and was available to the plaintiffs while they ran Century.

The court finds the government's arguments unpersuasive. To begin with, the government's reliance on *Glendale* and *Cal. Fed.* is based on a misapplication of those decisions to the facts of this case. In *Glendale* and *Cal. Fed.,* the Federal Circuit rejected restitution as a remedy where the restitution claim was based on the "net liabilities" assumed by the new institution. As the Federal Circuit recently explained in *LaSalle Talman Bank, FSB v. United States:*

> [T]he calculation of restitution damages based on the treatment of assumed "goodwill" liabilities as a cost of performance was generally resolved in *Glendale,* 239 F.3d at 1382–83, where this court held that damages are not properly keyed to "a liability that was at most a paper calculation." ... [W]e agree with the Court of Federal Claims [that assumed liabilities] are not a useable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages.

*LaSalle,* 317 F.3d 1363, 1376 (Fed.Cir.2003). *See also Cal. Fed.,* 245 F.3d at 1351.

4. Plaintiffs also seek restitution under an implied-in-law contract, or unjust enrichment theory, in addition to restitution as a "contract" remedy. Because this court has already determined that plaintiffs had an implied-in-fact con-

tract, and that the court does not have jurisdiction over implied-in-law contracts, plaintiffs' restitution claim based on an implied-in-law contract is dismissed.

This case does not involve a restitution claim based on "assumed liabilities." There is nothing in *La Salle* to suggest that restitution is not an appropriate remedy in situations like the present where a capital infusion was required as part of the contract and the plaintiffs lost their investment when the thrift failed.[5] *See also Hansen Bancorp v. United States,* 53 Fed.Cl. 92, 104 (2002). This view is also consistent with the holdings of the Ninth Circuit in *Far West Fed. Bank, S.B. v. Office of Thrift Supervision–Director,* 119 F.3d 1358 (9th Cir.1997) and the Tenth Circuit in *Resolution Trust Corp. v. Fed. Sav. and Loan Ins. Corp.,* 25 F.3d 1493 (10th Cir.1994), in which restitution was awarded to investor plaintiffs.

The government's contention that restitution is not appropriate because the government was not the direct recipient of the cash infusion by the plaintiffs into Century is also without merit. The government was not the direct recipient in *Landmark* or *Hansen.* Indeed, as the Tenth Circuit noted in *Resolution Trust,* the Restatement of Restitution expressly notes that, "where promisor fails to perform, restitution is appropriate even though benefit was a transfer to a third party." *Id.* at 1505. *See* Restatement (First) of Restitution § 110 (1937).

In its initial liability ruling, this court held that plaintiffs' agreement to acquire Century, and to infuse capital into the converted institution, was made in exchange for the forbearances and treatment of goodwill that were given to them by the FHLBB. It is clear from the liability ruling that the plaintiffs were individual parties to the agreement with the FHLBB and were individually obligated to make a specific capital contribution. It was also apparent from the record that the government considered the plaintiffs' capital contribution to be of value to the government. The FHLBB Deputy Program Director explained the benefit to the Associate General Counsel, in response to concerns raised by the State of Illinois about the proposed conversion. As noted in the liability opinion, the State had charged that the transaction was not an "arms-length" transaction. In response, the FHLBB's Deputy Program Director stated, "[I]n our opinion the arms' length condition is met as the supervisory group of the FHLBB and purchasing group [the plaintiffs] are dealing with each other in the negotiation of the transaction *with their own best interests in mind.*" (Emphasis added.)[6] It is not disputed that plaintiffs made their individual contributions.

In light of these undisputed facts, the court finds that restitution is an appropriate remedy in this case, and that the amount of the plaintiffs' individual capital contributions is an appropriate measure of restitution. The plaintiffs are therefore entitled to summary judgment in their favor on their claim for a return of their collective $434,410 capital contribution as restitution for the govern-

5. The court is aware that *Landmark* involved a cash infusion as part of an Assistance Agreement with the FHLBB, however, following the Federal Circuit's holding in *Cal. Fed.,* the existence of an Assistance Agreement is not determinative of whether there was an agreement between the government and the investors regarding the use of goodwill. *Cal. Fed.,* 245 F.3d at 1347–48.

6. At oral argument the government argued for the first time, based on the holding in *Castle,* that restitution is not appropriate because these plaintiffs, like the plaintiffs in *Castle,* made "voluntary" contributions which are not recoverable under a "restitution" theory. Not only is this argument not timely, it is also not correct. The record in this case plainly demonstrates that these plaintiffs were individually named and required to make individual contributions as part of their contract with the government.

At oral argument the government also argued for the first time that these plaintiffs waived their right to restitution by continuing to operate the bank after FIRREA, and thus, they had acquiesced in the new capital requirements. Again, this argument is not timely and is not supported by the record. While it is true that these plaintiffs endeavored to save their investment after their initial post-FIRREA capital plan was rejected, their efforts failed. More importantly, however, plaintiffs' initiated this breach of contract action and claim for restitution on June 28, 1990, less than two weeks after the government had rejected plaintiffs' post-FIRREA capital plan on June 15, 1990. In such circumstances, it is plain that the plaintiffs objected to the government's post-FIRREA actions and did not waive their right to restitution by continuing to operate until the bank was placed in receivership in May 1991.

ment's breach.[7]

## B. Plaintiffs Lack Standing To Directly Recover Expectancy or Reliance Damages

■ Plaintiffs contend that their recovery should not be limited to $434,410, but that the court should find "in the alternative" that they are entitled to recover $621,640.71, which is equal to their alleged lost equity value, as measured by the Stock Agreement they had entered into with Century Bankcorp for the purchase of their stock prior to enactment of FIRREA. Plaintiffs argue that $621,640.71 is the appropriate measure of damages based on either a lost profits or a reliance damage theory.

The government argues that plaintiffs' claim for damages based on the diminution in their stock price must be dismissed on the grounds that plaintiffs do not have standing to seek their lost equity value. According to the government, the plaintiffs' claim based upon the loss of value in their stock is, in fact, a claim that belongs to the thrift or, here, the FDIC receiver. The court agrees.

Ordinarily, a cause of action arising from an injury to a corporation belongs solely to the corporation, even though the injury may have also caused the shareholders to have lost the value of their stock. *See generally* 12B Fletcher Cyclopedia of the Law of Private Corp. § 5913 (perm.ed., rev.vol.2000). "A suit for damages arising from an injury to the corporation can only be brought by the corporation itself or by a shareholder derivatively if the corporation fails to act, . . . since only the corporation has an action for wrongs committed against it." *Gaff v. FDIC,* 814 F.2d 311, 315 (6th Cir.1987) (citations omitted). In this connection, courts have held that "[t]he diminution in value of a stockholder's investment is a concomitant of the corporate injuries resulting in lost profits. A fortiori, any redress obtained by the corporations would run to the benefit of their stockholders, and to permit the latter to proceed with those claims would permit a double recovery." *W. Clay Jackson Enters., Inc. v. Grey-*

*hound Leasing & Fin. Corp.,* 463 F.Supp. 666, 671 (D.P.R.1979).

While the general rule prohibits stockholders from asserting claims belonging to the corporation (unless derivatively), courts have also recognized that if the act complained of also gives rise to a separate claim by an individual stockholder, then the stockholders may bring a suit in the stockholder's name to vindicate his or her individual rights. *See* Fletcher § 5913; *see also FDIC v. Howse,* 802 F.Supp. 1554 (S.D.Texas 1992). For example, it .is well-recognized that claims of stock dilution and a corresponding reduction in a shareholder's voting power is an individual claim and may be brought in the shareholder's name. *See* Fletcher § 5913.

In determining whether the cause of action for breach of contract belongs to the corporation or to the individual, courts will examine whether the individual was owed a duty that was separate and distinct from the duty owed to the corporation. *Schautteet v. Chester State Bank,* 707 F.Supp. 885, 888 (E.D.Texas 1988). Thus, if the injury to the shareholder does not stem from the injury to the corporation, courts have held that the shareholder's injury is separate and distinct. *See* Fletcher § 5913; *see also Strougo v. Bassini,* 282 F.3d 162 (2d Cir.2002); *Jensen v. Voyles,* 393 F.2d 131, 133 (10th Cir.1968) ("Although a stockholder may not recover in his own right for an injury to the corporation which causes a depreciation in value of his shares, the majority rule permits a stockholder who has been individually injured to sue in his own right even if the corporation is also injured.") (Footnotes omitted.) However, where the diminution in the value of stock is due to harm caused to the corporation, the injury is not separate and distinct, and thus, the cause of action belongs to the corporation. *Gaff,* 814 F.2d at 315; *accord Stevens v. Lowder,* 643 F.2d 1078, 1080 (5th Cir.1981); *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 696–97, 1980 WL 13154 (1980). As the Court of Appeals for the Sixth Circuit explained in *Gaff,* "a diminution in the value of corporate stock resulting from some depletion of or

---

7. Having concluded that plaintiffs are entitled to restitution, plaintiffs' rescission claim is now moot and will be dismissed.

injury to corporate assets is a direct injury only to the corporation; it is merely an indirect or incidental injury to an individual shareholder." *Gaff,* 814 F.2d at 315 (citations omitted); *see also In re Ionosphere Clubs, Inc.,* 17 F.3d 600, 606 (2d Cir.1994) ("The injury to the Preferred holders' contractual rights to receive dividend and sinking fund payments was not inflicted 'directly' or 'independently of the corporation.' ... [T]he injuries to the contract rights of the Preferred holders occurred only as an indirect consequence of those wrongs against Eastern.")

Here, it is plain from the undisputed facts that the breach of contract caused by the enactment of FIRREA resulted in an injury to Century, which then derivatively harmed the plaintiffs. The fact that the plaintiffs were parties to the contract with the FHLBB does not alter this result. The loss of incremental stock value (i.e. lost profits.) suffered by plaintiffs comes from the loss sustained by *the thrift.*[8] As such, the plaintiffs' alternative claim for expectancy and reliance damages based on the loss of the alleged incremental value of their stock must be dismissed for lack of standing.

### C. Plaintiffs' Taking Claim Must be Dismissed

■ The government contends that plaintiffs' claim for damages, based on an alleged taking of their property under the Fifth Amendment of the U.S. Constitution, must also be dismissed. According to the government, the Federal Circuit's recent holding in *Castle* mandates that the court reject the plaintiffs' taking claim. In *Castle,* the Federal Circuit ruled that FIRREA did not give rise to a taking of any contract rights by the government, because contracting parties retained the "full range of remedies associated any contractual property right they possessed." *Castle,* 301 F.3d at 1342. In other words, because FIRREA did not take away plaintiffs' contract remedies, FIRREA did not cause a taking. *Id.*

In their briefs, plaintiffs argued that *Castle* is not controlling because it does not resolve

the taking issue in this case.[9] Plaintiffs argued that before the court may dismiss their taking claim, the court must engage in a case-specific inquiry to determine whether a taking has occurred. Here, plaintiffs contend that the court must allow plaintiffs to prove how FIRREA resulted in a taking of their "shareholder equity," i.e. the amount they invested in Century. Plaintiffs argue that the government was not free to "take" their investment by enacting FIRREA, without paying just compensation.

Contrary to the contentions in their brief, their argument has been addressed and rejected by the Federal Circuit in *Castle.* Plaintiffs' taking claim turns on their contention that, because they were required to put $434,410 into Century under their agreement or contract with the FHLBB, and FIRREA caused the plaintiffs to forfeit their investment, FIRREA caused a taking of plaintiffs' investment. At bottom, the plaintiffs taking argument is based on the contract that they entered into with the FHLBB. The *Castle* court expressly held that FIRREA did not take any contract rights. The Circuit agreed with the Court of Federal Claims that FIRREA did not take any *contract* rights because the parties "retained the full range of remedies associated with any contractual property right they possessed." *Castle* at 1342. Moreover, in the present case, the court has granted to the plaintiffs the contract remedy of restitution, i.e. the return of their investment, based upon the breach of contract that occurred upon enactment of FIRREA. Plaintiffs' taking claims are therefore dismissed.

### D. Plaintiffs Are Not Entitled to A Judgment *Nunc Pro Tunc*

■ Having concluded that the plaintiffs are entitled to restitution in the amount of their initial investment, the court must now deal with plaintiffs' request that the court issue its judgment *nunc pro tunc* to the date of their original motion for summary judgment in 1991, so that they can receive inter-

---

8. This loss is distinct from the loss of their initial investment, which the court has determined they are entitled to as restitution.

9. At oral argument, counsel for plaintiffs conceded that *Castle* was controlling in this case.

est from that date. The plaintiffs recognize that they are not entitled to pre-judgment interest. Nonetheless, plaintiffs argue that by entering a judgment, *nunc pro tunc*, it "would at least allow the plaintiffs to recover interest at the [post-] judgment rate."

The government argues that plaintiffs' request is an improper attempt to circumvent the bar against pre-judgment cases which applies in this case. According to the government, the court cannot avoid the bar against pre-judgment interest absent express statutory authority by simply changing the date for entry of judgment.

Because Congress has not expressly provided for either pre- or post-judgment interest on judgments entered by this Court in *Winstar*-related cases, the plaintiffs' request for judgment *nunc pro tunc*, in order to obtain interest, fails. Pre-judgment interest is not authorized without express congressional authority. *See Library of Congress v. Shaw* 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), *superseded by* statute on other grounds. ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award.") Similarly, post-judgment interest is not allowed on judgments from this Court, unless a statute or an express contractual provision specifically provides for the assessment of such interest. *See Zumerling v. Marsh*, 783 F.2d 1032, 1034 (Fed.Cir.1986). The court cannot circumvent the interest prohibition by awarding judgment *nunc pro tunc* or otherwise. Plaintiffs' request for entry of judgment *nunc pro tunc* is therefore denied.

### *CONCLUSION*

For the above stated reasons, the parties' cross-motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**. Specifically, defendant's motion for summary judgment, filed December 16, 2002, is **GRANTED** with respect to plaintiffs' claims for reliance and expectancy damages, as well as plaintiffs' taking claim, but defendant's motion is **DENIED** with respect to plaintiffs' restitution claim. Plaintiffs' cross-motion for summary judgment, filed December 20, 2002, is **GRANTED** with respect to the restitution claim and **DENIED** with respect to claims for reliance and expectancy damages, as well as the plaintiffs' taking claim and judgment *nunc pro tunc*. Further, plaintiffs' Motion to Strike 84 Pages of Attachments, filed February 10, 2003, is **DENIED**.

The Clerk of the Court shall enter judgment for the plaintiffs in the amount of $434,410. Each party to bear its own costs.